Zara FOSTER et al., Appellants,

v.

The ATLANTIC REFINING COMPANY, Appellee.

The ATLANTIC REFINING COMPANY, Appellant,

v.

Zara FOSTER et al., Appellees.

No. 20642.

United States Court of Appeals
Fifth Circuit.

March 26, 1964.

Rehearing Denied April 29, 1964.

Homer E. Dean, Jr., for Lloyd, Lloyd & Dean, Alice, Tex., Allen Wood, for Fischer, Wood, Burney & Nesbitt, Corpus Christi, Tex., J. G. Knight, Beeville, Tex., for appellants.

John G. Seaman, Corpus Christi, John W. Stayton, Black & Stayton, Austin, Tex., for appellee Atlantic Refining Co.

Before HUTCHESON, BREITEN-STEIN,* and BELL, Circuit Judges.

BREITENSTEIN, Circuit Judge.

We have here a complex controversy between lessors and lessee over their respective rights under a Texas oil and gas lease. The issues concern the failure to account for royalties due, to pay compensatory royalties, to produce and market, and to develop. The factual issues were presented to a jury which answered numerous special interrogatories. The trial court gave judgment in favor of the lessors and against the lessee in the sum of $154,931.29. Both sides have appealed.

In 1944 the Fosters, appellees and cross-appellants herein referred to as lessors or as Fosters, gave an oil and gas lease to The Atlantic Refining Company, appellant and cross-appellee herein referred to as lessee or as Atlantic. The lease covered 1,500 acres located in the Hagist Ranch Field, Duval County, Texas. The Hagist Ranch Field is a multi-reservoir field which produces both oil and gas. We shall discuss each appeal and issue separately.

## I.

### ATLANTIC APPEAL

(a) Failure to account for royalties.

The lessors contend that the lessee has not paid gas royalties to which they are

* Of the Tenth Circuit, sitting by designation.

entitled. The royalty clause reads in pertinent part:

"The conventional royalties to be paid by Lessee are: (a) On oil and gas, including all hydro-carbons, one-eighth (⅛th) of that produced and saved from said land, the same to be delivered to the credit of the Lessor into the pipe line and to be sold at the market price therefor prevailing for the field where produced when run; * * *."

In 1950, lessee made a 20-year gas sales contract with Texas Illinois Natural Gas Pipeline Company covering the Foster and other leases owned by Atlantic in the Hagist Ranch Field. The prices to be paid by the pipeline company per mcf were:

"7.0180 cents during the first five year period; 8.5531 cents during the next five year period; and 9.4304 cents during the third five year period.

"For the fourth five year period the price shall be the fair and reasonable value thereof as of the commencement of said period, taking into consideration the price then being paid for gas of similar quantity and quality sold for similar purposes in the general area of the Hagist Ranch Area, provided, however, that in no event shall such price be less than 10.0883 cents for each 1,000 cubic feet of gas."

The uncontroverted evidence is that the price prevailing for the field was 13 cents in 1957 and 14 cents for the period 1958–1962.[1] The Fosters claim that they are entitled to royalties based on these prices rather than on the prices fixed by the 1950 gas sales contract. The trial court agreed with the Fosters and, on this issue, gave them judgment for $75,012.51, the difference between what they were paid and what the court held they should have been paid.

The practicalities of the gas industry require that gas be sold under long-term contracts because the pipelines must have a committed source of supply sufficient to justify financing, construction, and operation.[2] The impact of this economic fact on the royalty clause of the Foster-Atlantic lease produces the problem presented here.

Undisputed testimony for Atlantic is that at the time it made the 1950 contract with Texas Illinois it received a higher initial price and an agreement for a substantially higher daily take of gas than could have been negotiated with the other two pipelines operating in the area.[3] The 13-cent and 14-cent prices on which the Fosters rely were established by the testimony of an expert who directed particular attention to four long-term contracts made in 1949, 1952, and 1956, and are not controverted by Atlantic.

Atlantic says that compliance with the royalty provision of the lease as interpreted by the Fosters and the trial court is impossible. It argues that no pipeline or other purchaser will buy large quantities of gas on a day to day or other short-term basis. In this the jury agreed as it answered in favor of Atlantic interrogatories presenting the questions of the salability of the gas on a day to day, month to month, or year to year basis. As we see the case these factors are immaterial. The Fosters make no claims based on short-term fluctuations in price. Instead they say that the market price of gas in 1957 was 13 cents and in the period 1958–1962 was 14 cents. Atlantic offered no evidence of day to day, month to month, or year to year fluctuations in price. This court said in Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F.2d 196, 198, that: " * * * [W]hen seeking market value of gas at the well we cannot require the application of rules of daily sales and daily quotations when there is no showing that such sales and

---

2. See Gex v. Texas Company, Tex.Civ. App., 337 S.W.2d 820, 828.

3. Texas Illinois had not then entered into the area.

quotations occur." The record conclusively establishes that the market price of the gas prevailing in the field when the gas was delivered to the pipeline was 13 cents in 1957 and 14 cents in the 1958–1962 period.

The impossibility argument is reduced to the question of the possibility of the inclusion in the 1950 contract of escalation provisions which would have assured the lessees the prevailing prices during the periods in question in this suit. Atlantic says, and the jury found, that such provisions could not have been incorporated in a contract having the initial price and delivery quantity agreements contained in the 1950 contract. The Fosters do not dispute this but say that such impossibility is no excuse.

■ The inability of Atlantic to make a gas sales contract with escalation provisions is beside the point. The obligation of Atlantic to pay royalties is fixed and unambiguous. It made the gas sales contract with full knowledge of this obligation and did nothing to protect itself against increases in price. The fact that its purchaser would not agree to pay the market price prevailing at the time of delivery does not destroy the lease obligation. The case falls within the rule thus stated in Ellwood v. Nutex Oil Co., Tex.Civ.App., 148 S.W.2d 862, 864:

> " * * * [O]ne who unconditionally obligates himself to do a thing possible of performance, must be held to perform it (citing cases); and though performance, subsequent

to the contract, may become difficult or even impossible, [this] does not relieve the promisor, and particularly where he might have foreseen the difficulty and impossibility (citing cases)."

When it made the gas sales contract, Atlantic took the calculated risk of that contract producing royalties satisfactory to the lease terms. The fact that increases in market prices have made the lease obligations financially burdensome is no defense.

■ Atlantic urges that the market price is the price at which the gas was sold in 1950. Developing this point it first says that the phrase "when run" applies to oil but not to gas on the theory that a "run" is a transfer of crude oil from stock tanks to a pipeline.[4] We see no reason why the phrase may not apply to gas and mean the time of delivery of gas from the well to the pipeline. Indeed, a witness for Atlantic so testified.[5]

■ Atlantic also says that the gas was sold in 1950 for future delivery. The difficulty is that under a Texas decision, Martin v. Amis, Tex.Com.App., 288 S.W. 431, 433, the 1950 contract was an executory contract for the sale of gas with an executed sale of gas being effected when the gas came into possession of the pipeline.

Atlantic argues that it is only required to use reasonable diligence in selling the Foster royalty gas and that the 1950 contract was not improvident. These argu-

---

4. See Long v. Magnolia Petroleum Company, 166 Neb. 410, 89 N.W.2d 245, 257.

5. Atlantic witness Echols testified in part thus:

"Q But what does the contract say?
"A This contract says to be sold at the market price therefor.
"Q Prevailing in the field?
"A Yes, sir.
"Q When run?
"A That's correct.
"Q When the gas is run, is that right?
"A That's right.
"Q All right. Now that gas is run every day that those wells produce, isn't it?

"A Yes, sir, but that gas is not sold every day when the leases are producing.
   *   *   *   *   *
"Q All right. Now then, when it says 'gas (sic) run,' let's get to that point next.
"A Well, of course, the terminology 'run' does not actually apply to gas, but I would twist and say it probably refers to it at the time it is delivered to the pipeline.
"Q Now it actually refers to it there, doesn't it?
"A I presume it does."

ments beg the question. The royalty provision is clear. Granting that the 1950 contract was provident when made, that fact does not change the royalty provisions.

Stripped of all the trimmings Atlantic's position is simply: We cannot comply. This is no answer. The lease calls for royalty based on the market price prevailing for the field where produced when run. The fact that the ascertainment of future market price may be troublesome or that the royalty provisions are improvident and result in a financial loss to Atlantic "is not a web of the Court's weaving."[6] Atlantic cannot expect the court to rewrite the lease to Atlantic's satisfaction.

■■■ This brings us to the contention of Atlantic that the lessors ratified the 1950 contract by accepting the royalties payable thereunder and are now estopped to claim royalties based on a higher market price. Atlantic relies on the principle that ratification is established where a principal, though having no prior knowledge of the unauthorized acts of his agent, retains benefits after acquiring full knowledge of those acts.[7]

The accepted principles of agency and estoppel do not apply in the circumstances of this case. Atlantic had the right to make a sales contract for lessors' gas. That contract was valid and the lessors could do nothing about it. In that contract Atlantic warranted its title and agreed to pay royalties "in accordance with the terms of the respective leases." The facts and law establish the right of the Fosters to a royalty based on a high-

er price than that provided in the 1950 contract. This court has held that the acceptance by the lessors of less royalty than that to which they were entitled does not "extinguish the entire debt nor work an estoppel."[8] By keeping less than was due them, and something to which they were entitled in any event, the Fosters have not ratified the act of Atlantic in selling their royalty gas for less than the prevailing market price.

■■■ Atlantic says that the 4-year statute of limitations bars recovery as the breach, if there was one, occurred in 1950 when the gas sales contract was executed.[9] As previously stated, the 1950 contract was not a present sale of the gas.[10] The Texas rule is that the statute begins to run on money due as royalty under a written contract when such money is due and payable.[11] In the case before us the money did not become due and payable until after an executed sale of the gas was made by the delivery of the gas to the pipeline.

The trial court correctly held that the Fosters were entitled to royalty on the prices prevailing in the period 1957–1962.

(b) Failure to pay compensatory royalty.

The lease required Atlantic to drill an offset well "in the event a well or wells producing oil or gas in paying quantities should be hereafter brought in on adjacent land within six hundred fifty (650) feet of the leased premises," or to pay compensatory royalty based on the production of the well within the 650-foot limit.[12]

---

6. Phillips Petroleum Co. v. Bynum, 5 Cir., 155 F.2d 196, 198, certiorari denied 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620.

7. See Blackburn v. Automobile Finance Co., Tex.Civ.App., 121 S.W.2d 388, 389.

8. Arkansas Natural Gas Corporation v. Sartor, 5 Cir., 98 F.2d 527, 530, certiorari denied 305 U.S. 649, 59 S.Ct. 243, 83 L.Ed. 120.

9. See Vernon's Ann.Civ.St. art. 5527.

10. See Martin v. Amis, Tex.Com.App., 288 S.W. 431, 433.

11. See Hickok Producing & Development Co. v. Texas Co., 5 Cir., 128 F.2d 183, 185; Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185, 190, certiorari denied 329 U.S. 730, 67 S.Ct. 87, 91 L.Ed. 632.

12. The pertinent lease provision reads: "In the event a well or wells producing oil or gas in paying quantities should be hereafter brought in on adjacent land within six hundred fifty (650) feet of the leased premises, Lessee agrees to commence operations for the drilling of an offset well on the leased premises with-

The Fosters claimed, and the trial court found, that two wells, known as Mobil No. 1-B and Mobil No. 2-B, on adjacent land required offsets under the lease provisions. Compensatory royalties were awarded in the sum of $16,679.74 because of Mobil No. 1-B and of $3,971.-88 because of Mobil No. 2-B.

Atlantic says that the express offset clause in the original lease was eliminated by a 1953 amendment. This amendment brought additional acreage into the lease, required the drilling of certain wells, provided for reasonable development, and carried forward all obligations of the lease except as amended. Atlantic is wrong. Obligations to develop reasonably and to drill offset wells, whether they be express or implied, are two separate matters.[13] The purpose of the former is inherent in its characterization and the purpose of the latter is to prevent drainage from wells drilled on adjoining land. No overlap or inconsistency exists.[14]

Atlantic next urges that a demand for an offset is a prerequisite to liability for failure to drill. The lease does not provide for demand. Cases which require notice and demand as a preface to an action for forfeiture or termination[15] are not in point. General Crude Oil Co. v. Harris, Tex.Civ.App., 101 S.W.2d 1098, 1101, holds that in a suit to recover damages for failure to develop reasonably, notice is not a prerequisite to liability. The same rule applies here.

The lease contains a provision for the surrender of acreage and avoidance of obligations not yet accrued. Atlantic urges that if demand had been made it could have then determined whether to release acreage. Without deciding if the surrender of acreage provision applies to the situation under discussion, the answer is that the suit was a demand and Atlantic has not offered to surrender any acreage.

The lease provision calls for "an offset well." This means that for each well drilled within the 650-foot strip Atlantic is required to drill one—not more than one—offset on the Foster lease premises. The Fosters seek to rely on the implied obligation to protect against drainage. This implied covenant has been superseded by an express agreement and the express agreement controls.[16]

The Mobil wells are located on a peninsula which extends into the Foster land and is surrounded on three sides by Foster land. No offset was drilled to Mobil No. 2-B and the Fosters are entitled to compensatory royalty. The corner location of Mobil No. 1-B is such that it is within 650 feet of both a Foster west line and a Foster north line. The Fosters claim that they are entitled to two offsets to Mobil No. 1-B—one to the east and one to the south. We hold that under the lease they are entitled to only one. A south offset, Atlantic No. 41, was completed April 21, 1960. The Fosters are entitled to compensatory damages only to that date. The court awarded damages for compensatory royalties for

in thirty (30) days from the completion of such well to be offset, and to thereafter prosecute the drilling thereof with reasonable diligence to the formation from which such offset well is producing; unless such offset well to the same horizon has theretofore been drilled by Lessee; provided, however, that Lessee may defer indefinitely the drilling of such offset well so long as it pays the same conventional royalty and production payment on the production from the well on such adjacent land within the time and in the manner as would be required of Lessee had such well on the offset premises have

been drilled upon and produced from the premises covered by this lease."

13. See Stanolind Oil & Gas Co. v. Christian, Tex.Civ.App., 83 S.W.2d 408, 409.

14. See Walker, "The Nature of the Property Interests Created by an Oil and Gas Lease in Texas," 11 Tex.L.Rev. 399, 401–402.

15. See Hoover v. General Crude Oil Co., 147 Tex. 89, 212 S.W.2d 140, 143.

16. See Hutchins v. Humble Oil & Refining Co., Tex.Civ.App., 161 S.W.2d 571, 573; Coats v. Brown, Tex.Civ.App., 301 S.W. 2d 932, 935–937.

a period ending November 1, 1962. The case must be remanded for the determination of the correct amount.

(c) Failure to produce and market.

■ This point pertains to gas production from the Upper Wilcox sand. Evidence for the Fosters was that, during the period in dispute, Atlantic produced a smaller percentage of the total Upper Wilcox gas allowable given wells on the Foster lease by the Railroad Commission of Texas than the percentage produced by Atlantic of the total Upper Wilcox gas allowable given wells on the Hagist Ranch lease by the Railroad Commission. The Hagist Ranch lease adjoins the Foster lease on the east. Fosters' position was sustained by the jury which found that "Atlantic produced and marketed less Upper Wilcox gas from the wells on the Foster lease during the period from January 1, 1957, to January 1, 1962, than a reasonably prudent operator would have produced and marketed under the same or similar circumstances." On this issue the court gave the Fosters judgment for $28,397.53.

Here again, Atlantic makes a scattergun attack. In essence it argues that Texas law merely requires that a lessee produce the lease's "fair share" of the pool,[17] and that comparison of production by means of percentage of allowable figures is not relevant to show lack of reasonable development under the "fair share" test. The answer is that such comparison shows an unfair discrimination in favor of the Hagist Ranch lease.[18]

The contention of Atlantic that the existing Foster wells would not produce more gas is beside the point. On conflicting evidence the jury found that Atlantic produced and sold less Upper Wilcox gas from the Foster lease than a reasonably prudent operator would have in the circumstances. The finding has substantial support in the evidence.

One phase of this issue is bothersome and difficult of solution. The claim of the Fosters is that they are entitled to the same share of the allowable as that produced from the Hagist Ranch lease. For example, they say that if Atlantic produced 103% of the allowable from Hagist, they are entitled to the same percentage of allowable from their lease. The Fosters do not question the assertion of Atlantic that it would be impossible, in view of the market, to produce and sell more gas than it did. As this total remains constant, a balance must be struck. The trial court did not do this when it gave judgment to the Fosters on the basis of the same percentage of allowable as that produced from the Hagist Ranch. That method requires Atlantic to pay royalty on more production than was or could have been sold. Atlantic says that the error can be corrected by cutting the award in two. This may be right but on the state of the record we are uncertain. The case must be remanded for recomputation of damages on this issue.

(d) Failure to develop.

The court awarded the Fosters damages in the sum of $30,869.63 because of Atlantic's failure to have a well producing gas from the Upper Wilcox sand in a specified portion of Section 268. Atlantic concedes that the Fosters are entitled to recovery on this claim but says that the court erred in computing damages on the basis of the Fosters' claim of market price. We have heretofore held that the issue of market price was correctly decided in favor of the Fosters.

17. See Halbouty v. Railroad Commission, 163 Tex. 417, 357 S.W.2d 364, 375–376, certiorari denied 371 U.S. 888, 83 S.Ct. 185, 9 L.Ed.2d 122.

18. Atlantic says in its brief that to bring the Foster production to a parity with the Hagist Ranch production, Atlantic would have had to produce an additional 1,514,196 mcf of Upper Wilcox gas from the Foster lease. The Fosters do not question this figure but we are unable to varify it in the complicated record.

## II.

### FOSTER APPEAL

#### (a) Failure to drill offset well.

█ The Fosters claim compensatory royalties because of Atlantic's failure to drill a west offset well to Fair No. 3 in the Lower Wilcox sand. Fair No. 3 is an offset to Atlantic No. 21 and is located within 330 feet of the lease lines.

We have mentioned the lease provision requiring an offset well or compensatory damages when a producing well is drilled within 650 feet of the Foster lease. The conformation of the Foster lease line is such that Fair No. 3 has a corner location within 650 feet of a Foster east line and a Foster south line.

The Foster contention is that they are entitled to two offsets, one to the north and one to the west. Atlantic No. 21 is a north offset. In connection with our discussion of the Atlantic appeals we have held that the lease requires only one offset to each competing well. The holding of the trial court was correct.

#### (b) Failure to develop.

█ This issue has three separate points. The first relates to the claim of the Fosters that Atlantic failed to develop reasonably the Lower Wilcox gas sand in Section 270 covered by the Fosters' lease. Atlantic says drilling of the desired well is unnecessary as the existing wells will produce the amount of gas which Texas Illinois takes under the 1950 contract. It is enough to say that on conflicting evidence the jury found that Atlantic had made reasonable development.

The second point is the claim of lack of reasonable development of the Lower Wilcox sand of Section 269, a part of the Hagist Ranch lease on which the Fosters hold an overriding royalty interest. Atlantic says that it is not required to develop Section 269 as a separate tract.[19]

The Fosters produced no evidence that such separate development is required. The jury found that the Atlantic development was reasonable. This finding is sustained by the record.

The third point concerns Atlantic's failure to drill a gas well to the Upper Wilcox sand in Section 268 covered by the Foster lease. Atlantic claims that under the regulations of the Railroad Commission it had drilled as many wells to the Upper Wilcox as are allowed. In any event, on conflicting evidence the jury found the development reasonable.

█ The Fosters also urge that the Upper and Lower Wilcox sands are being drained by wells to the north and they are entitled to protection against such drainage. As we have shown, the lease contains an express provision for offset wells. Under this provision the Fosters are not entitled to the wells they seek. Because of the express agreement on offset obligations, we will not imply any different offset obligations.[20]

#### (c) Miscellaneous matters.

The objections of the Fosters to the instructions merit no comment.

█ The Fosters contend they are entitled to a new trial on the issue of reasonable development because the jury was confused. In our opinion the jury, under the able instructions of the court, did an excellent job in determining the factual issues of a complicated case. Certainly, the court did not abuse its discretion in refusing to grant a new trial.[21]

The judgment is reversed for the re-ascertainment of damages arising from the failure to pay compensatory royalties due because of the Mobil No. 1-B well and from the failure to maintain a balanced production of gas from the Upper Wilcox sand. In all other respects the judgment is affirmed.

The costs will be divided equally between the parties.

19. See Felmont Oil Corporation v. Pan American Petroleum Corporation, Tex. Civ.App., 334 S.W.2d 449, 553.

20. See authorities cited in note 16, supra.

21. See Marsh v. Illinois Cent. R. Co., 5 Cir., 175 F.2d 498, 499–500; Pennsylvania Thresherman & Farmers' Mut-Cas. Ins. Co. v. Crapet, 5 Cir., 199 F.2d 850, 853.