EASTERN AIR LINES, INC., Plaintiff,

v.

GULF OIL CORPORATION, Defendant.

No. 74–335–Civ–JLK.

United States District Court,
S. D. Fla.

Oct. 20, 1975.

---

Gambrell, Russell, Killorin & Forbes, Atlanta, Ga., William G. Bell, Jr., Eastern Air Lines, Inc., Miami International Airport, Walton Lantaff Schroeder Carson & Wahl, Miami, Fla., for plaintiff.

Smathers & Thompson, Miami, Fla., W. B. Edwards, Gulf Oil Co., Houston, Tex., for defendant.

## OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, District Judge.

Eastern Air Lines, Inc., hereafter Eastern, and Gulf Oil Corporation, hereafter Gulf, have enjoyed a mutually advantageous business relationship involving the sale and purchase of aviation fuel for several decades.

This controversy involves the threatened disruption of that historic relationship and the attempt, by Eastern, to enforce the most recent contract between the parties. On March 8, 1974 the correspondence and telex communications between the corpo-

rate entities culminated in a demand by Gulf that Eastern must meet its demand for a price increase or Gulf would shut off Eastern's supply of jet fuel within fifteen days.

Eastern responded by filing its complaint with this court, alleging that Gulf had breached its contract[1] and requesting preliminary and permanent mandatory injunctions requiring Gulf to perform the contract in accordance with its terms. By agreement of the parties, a preliminary injunction preserving the status quo was entered on March 20, 1974, requiring Gulf to perform its contract and directing Eastern to pay in accordance with the contract terms, pending final disposition of the case.

Gulf answered Eastern's complaint, alleging that the contract was not a binding requirements contract, was void for want of mutuality, and, furthermore, was "commercially impracticable" within the meaning of Uniform Commercial Code § 2–615; Fla. Stat. §§ 672.614 and 672.615.[2]

The extraordinarily able advocacy by the experienced lawyers for both parties produced testimony at the trial from internationally respected experts who described in depth economic events that have, in recent months, profoundly affected the lives of every American.

### THE CONTRACT

On June 27, 1972, an agreement was signed by the parties which, as amended, was to provide the basis upon which Gulf was to furnish jet fuel to Eastern at certain specific cities in the Eastern system. Said agreement supplemented an existing contract between Gulf and Eastern which, on June 27, 1972, had approximately one year remaining prior to its expiration.

The contract is Gulf's standard form aviation fuel contract and is identical in all material particulars with the first contract for jet fuel, dated 1959, between Eastern and Gulf and, indeed, with aviation fuel contracts antedating the jet age. It is similar to contracts in general use in the aviation fuel trade. The contract was drafted by Gulf after substantial arm's length negotiation between the parties. Gulf approached Eastern more than a year before the expiration of the then-existing contracts between Gulf and Eastern, seeking to preserve its historic relationship with Eastern. Following several months of negotiation, the contract, consolidating and extending the terms of several existing contracts, was executed by the parties in June, 1972, to expire January 31, 1977.

The parties agreed that this contract, as its predecessor, should provide a reference to reflect changes in the price of the raw material from which jet fuel is processed, i. e., crude oil, in direct proportion to the cost per gallon of jet fuel.

Both parties regarded the instant agreement as favorable, Eastern, in part, because it offered immediate savings in projected escalations under the existing agreement through reduced base prices at the contract cities; while Gulf found a long term outlet for a capacity of jet fuel coming on stream from a newly completed refinery, as well as a means to relate anticipated increased cost of raw material (crude oil) directly to the price of the refined product sold. The previous Eastern/Gulf contracts contained a price index clause which operated to pass on to Eastern only one-half of any increase in the price of crude oil. Both parties knew at the time of contract negotiations that increases in crude oil prices would be expected, were "a way of life", and intended that

---

1. Eastern's complaint as filed, and as subsequently amended, contained other counts, alleging tort, antitrust, and FEA violations. Gulf successfully moved to strike those counts from the complaint, alleging that because the preliminary injunction was granted as Eastern had prayed, Eastern did not suffer the damages alleged in its complaint.

2. Gulf also, in addition to answering the complaint, filed a counterclaim, asking the court to set a price for jet fuel to be provided under the contract. By agreement of counsel, consideration of the counterclaim was deferred pending disposition of Eastern's breach of contract count, it being understood that if Eastern prevailed on its claim, Gulf's counterclaim would stand dismissed as moot.

those increases be borne by Eastern in a direct proportional relationship of crude oil cost per barrel to jet fuel cost per gallon.

Accordingly, the parties selected an indicator (West Texas Sour); a crude which is bought and sold in large volume and was thus a reliable indicator of the market value of crude oil. From June 27, 1972 to the fall of 1973, there were in effect various forms of U.S. government imposed price controls which at once controlled the price of crude oil generally, West Texas Sour specifically, and hence the price of jet fuel. As the government authorized increased prices of crude those increases were in turn reflected in the cost of jet fuel. Eastern has paid a per gallon increase under the contract from 11 cents to 15 cents (or some 40%).

The indicator selected by the parties was "the average of the posted prices for West Texas sour crude, 30.0–30.9 gravity of Gulf Oil Corporation, Shell Oil Company, and Pan American Petroleum Corporation". The posting of crude prices under the contract "shall be as listed for these companies in Platts Oilgram Service—Crude Oil Supplement . . ."

"Posting" has long been a practice in the oil industry. It involves the physical placement at a public location of a price bulletin reflecting the current price at which an oil company will pay for a given barrel of a specific type of crude oil. Those posted price bulletins historically have, in addition to being displayed publicly, been mailed to those persons evincing interest therein, including sellers of crude oil, customers whose price of product may be based thereon, and, among others, Platts Oilgram, publishers of a periodical of interest to those related to the oil industry.

In recent years, the United States has become increasingly dependent upon foreign crude oil, particularly from the "OPEC" nations [3] most of which are in the Middle East. OPEC was formed in 1970 for the avowed purpose of raising oil prices, and has become an increasingly cohesive and potent organization as its member na-

tions have steadily enhanced their equity positions and their control over their oil production facilities. Nationalization of crude oil resources and shutdowns of production and distribution have become a way of life for oil companies operating in OPEC nations, particularly in the volatile Middle East. The closing of the Suez Canal and the concomitant interruption of the flow of Mid-East oil during the 1967 "Six-Day War", and Libya's nationalization of its oil industry during the same period, are only some of the more dramatic examples of a trend that began years ago. By 1969 "the handwriting was on the wall" in the words of Gulf's foreign oil expert witness, Mr. Blackledge.

During 1970 domestic United States oil production "peaked"; since then it has declined while the percentage of imported crude oil has been steadily increasing. Unlike domestic crude oil, which has been subject to price control since August 15, 1971, foreign crude oil has never been subject to price control by the United States Government. Foreign crude oil prices, uncontrolled by the Federal Government, were generally lower than domestic crude oil prices in 1971 and 1972; during 1973 foreign prices "crossed" domestic prices; by late 1973 foreign prices were generally several dollars per barrel higher than controlled domestic prices. It was during late 1973 that the Mid-East exploded in another war, accompanied by an embargo (at least officially) by the Arab oil-producing nations against the United States and certain of its allies. World prices for oil and oil products increased.

Mindful of that situation and for various other reasons concerning the nation's economy, the United States government began a series of controls affecting the oil industry culminating, in the fall of 1973, with the implementation of price controls known as "two-tier". In practice "two-tier" can be described as follows: taking as the bench mark the number of barrels produced from a given well in May of 1972, that number of barrels is deemed "old" oil. The price of

---

**3.** "Organization of Petroleum Exporting Countries"

"old" oil then is frozen by the government at a fixed level. To the extent that the productivity of a given well can be increased over the May, 1972, production, that increased production is deemed "new" oil. For each barrel of "new" oil produced, the government authorized the release from price controls of an equivalent number of barrels from those theretofore designated "old" oil. For example, from a well which in May of 1972, produced 100 barrels of oil; all of the production of that well would, since the imposition of "two-tier" in August of 1973, be "old" oil. Increased productivity to 150 barrels would result in 50 barrels of "new" oil and 50 barrels of "released" oil; with the result that 100 barrels of the 150 barrels produced from the well would be uncontrolled by the "two-tier" pricing system, while the 50 remaining barrels of "old" would remain government price controlled.

The implementation of "two-tier" was completely without precedent in the history of government price control action. Its impact, however, was nominal, until the imposition of an embargo upon the exportation of crude oil by certain Arab countries in October, 1973. Those countries deemed sympathetic to Israel were embargoed from receiving oil from the Arab oil producing countries. The United States was among the principal countries affected by that embargo, with the result that it experienced an immediate "energy crises".

Following closely after the embargo, OPEC (Oil Producing Export Countries) unilaterally increased the price of their crude to the world market some 400% between September, 1973, and January 15, 1974. Since the United States domestic production was at capacity, it was dependent upon foreign crude to meet its requirements. New and released oil (uncontrolled) soon reached parity with the price of foreign crude, moving from approximately $5 to $11 a barrel from September, 1973, to January 15, 1974.

Since imposition of "two-tier", the price of "old oil" has remained fixed by government action, with the oil companies resorting to postings reflecting prices they will pay for the new and released oil, not subject to government controls. Those prices, known as "premiums", are the subject of supplemental bulletins which are likewise posted by the oil companies and furnished to interested parties, including Platts Oil-gram.

Platts, since the institution of "two-tier" has not published the posted prices of any of the premiums offered by the oil companies in the United States, including those of Gulf Oil Corporation, Shell Oil Company and Pan American Petroleum, the companies designated in the agreement. The information which has appeared in Platts since the implementation of "two-tier" with respect to the price of West Texas Sour crude oil has been the price of "old" oil subject to government control.

Under the court's restraining order, entered in this cause by agreement of the parties, Eastern has been paying for jet fuel from Gulf on the basis of the price of "old" West Texas Sour crude oil as fixed by government price control action, i. e., $5 a barrel. Approximately 40 gallons of finished jet fuel product can be refined from a barrel of crude.

Against this factual background we turn to a consideration of the legal issues.

I

THE "REQUIREMENTS" CONTRACT

Gulf has taken the position in this case that the contract between it and Eastern is not a valid document in that it lacks mutuality of obligation; it is vague and indefinite; and that it renders Gulf subject to Eastern's whims respecting the volume of jet fuel Gulf would be required to deliver to the purchaser Eastern.

The contract talks in terms of fuel "requirements".[4] The parties have interpreted this provision to mean that any aviation

---

4. "Gulf agrees to sell and deliver to Eastern, and Eastern agrees to purchase, receive and

pay for their requirements of Gulf Jet A and Gulf Jet A–1 at the locations listed . . .."

fuel purchased by Eastern at one of the cities covered by the contract, must be bought from Gulf. Conversely, Gulf must make the necessary arrangements to supply Eastern's reasonable good faith demands at those same locations. This is the construction the parties themselves have placed on the contract and it has governed their conduct over many years and several contracts.

In early cases, requirements contracts were found invalid for want of the requisite definiteness, or on the grounds of lack of mutuality. Many such cases are collected and annotated at 14 A.L.R. 1300.

As reflected in the foregoing annotation, there developed rather quickly in the law the view that a requirements contract could be binding where the purchaser had an operating business. The "lack of mutuality" and "indefiniteness" were resolved since the court could determine the volume of goods provided for under the contract by reference to objective evidence of the volume of goods required to operate the specified business. Therefore, well prior to the adoption of the Uniform Commercial Code, case law generally held requirements contracts binding. See 26 A.L.R.2d 1099, 1139.

■ The Uniform Commercial Code, adopted in Florida in 1965, specifically approves requirements contracts in F.S. 672.-306 (U.C.C. § 2–306(1)).

> "(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

The Uniform Commercial Code Official Comment interprets § 2–306(1) as follows:

> "2. Under this Article, a contract for output or requirements is not too indefinite since it is held to mean the actual good faith output or requirements of the particular party. Nor does such a contract lack mutuality of obligation since, under this section, the party who will determine quantity is required to operate his plant or conduct his business in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure. Reasonable elasticity in the requirements is expressly envisaged by this section and good faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance. A shut-down by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not. The essential test is whether the party is acting in good faith. Similarly, a sudden expansion of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal expansion undertaken in good faith would be within the scope of this section. One of the factors in an expansion situation would be whether the market price has risen greatly in a case in which the requirements contract contained a fixed price. Reasonable variation of an extreme sort is exemplified in *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.,* 102 F.2d 630 (C.C.A. 10, 1939)."

Some of the prior Gulf-Eastern contracts have included the estimated fuel requirements for some cities covered by the contract while others have none. The particular contract contains an estimate for Gainesville, Florida requirement.

■ The parties have consistently over the years relied upon each other to act in good faith in the purchase and sale of the required quantities of aviation fuel specified in the contract. During the course of the contract, various estimates have been exchanged from time to time, and, since the advent of the petroleum allocations programs, discussions of estimated require-

ments have been on a monthly (or more frequent) basis.[5]

The court concludes that the document is a binding and enforceable requirements contract.

## II

## BREACH OF CONTRACT

■ Gulf suggests that Eastern violated the contract between the parties by manipulating its requirements through a practice known as "fuel freighting" in the airline industry. Requirements can vary from city to city depending on whether or not it is economically profitable to freight fuel. This fuel freighting practice in accordance with price could affect lifting from Gulf stations by either raising such liftings or lowering them. If the price was higher at a Gulf station, the practice could have reduced liftings there by lifting fuel in excess of its actual operating requirements at a prior station, and thereby not loading fuel at the succeeding high price Gulf station. Similarly where the Gulf station was comparatively cheaper, an aircraft might load more heavily at the Gulf station and not load at other succeeding non-Gulf stations.

The court however, finds that Eastern's performance under the contract does not constitute a breach of its agreement with Gulf and is consistent with good faith and established commercial practices as required by U.C.C. § 2–306.

5. A requirements contract under the U.C.C. may speak of "requirements" alone, or it may include estimates, or it may contain maximums and minimums. In any case, the consequences are the same, as Official Comments 2 and 3 indicate. Comment 2 is set out in the text above. Comment 3 provides:
   "3. If an estimate of output or requirements is included in the agreement, no quantity unreasonably disproportionate to it may be tendered or demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur."

6. U.C.C. § 2–208(1) defines "course of performance" as those "repeated occasions for performance by either party with knowledge of

"Good Faith" means "honesty in fact in the conduct or transaction concerned" U.C.C. § 1–201(19). Between merchants, "good faith" means "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade"; U.C.C. § 2–103(1)(b) and Official Comment 2 of U.C.C. § 2–306. The relevant commercial practices are "courses of performance," "courses of dealing" and "usages of trade."[6]

Throughout the history of commercial aviation, including 30 years of dealing between Gulf and Eastern, airlines' liftings of fuel by nature have been subject to substantial daily, weekly, monthly and seasonal variations, as they are affected by weather, schedule changes, size of aircraft, aircraft load, local airport conditions, ground time, availability of fueling facilities, whether the flight is on time or late, passenger convenience, economy and efficiency of operation, fuel taxes, into-plane fuel service charges, fuel price, and, ultimately, the judgment of the flight captain as to how much fuel he wants to take.

All these factors are, and for years have been, known to oil companies, including Gulf, and taken into account by them in their fuel contracts. Gulf's witnesses at trial pointed to certain examples of numerically large "swings" in monthly liftings by Eastern at various Gulf stations. Gulf never complained of this practice and apparently accepted it as normal procedure. Some

the nature of the performance and opportunity for objection to it by the other."
   U.C.C. § 1–205(1) defines "course of dealing" as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."
   U.C.C. § 1–205(2) defines "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question."
   U.C.C. § 2–208(2) provides that "express terms shall control course of performance and course of performance shall control both course of dealings and usage of trade."

of the "swings" were explained by the fueling of a single aircraft for one flight, or by the addition of one schedule in mid-month. The evidence establishes that Eastern, on one occasion, requested 500,000 additional gallons for one month at one station, without protest from Gulf, and that Eastern increased its requirements at another station more than 50 percent year to year, from less than 2,000,000 to more than 3,000,000 gallons, again, without Gulf objection.

The court concludes that fuel freighting is an established industry practice, inherent in the nature of the business. The evidence clearly demonstrated that the practice has long been part of the established courses of performance and dealing between Eastern and Gulf. As the practice of "freighting" or "tankering" has gone on unchanged and unchallenged for many years accepted as a fact of life by Gulf without complaint, the court is reminded of Official Comment 1 to U.C.C. § 2–208:

> "The parties themselves know best what they have meant by their words of agreement and their action under that agreement is the best indication of what that meaning was."

From a practical point of view, "freighting" opportunities are very few, according to the uncontradicted testimony, as the airline must perform its schedules in consideration of operating realities. There is no suggestion here that Eastern is operating at certain Gulf stations but taking no fuel at all. The very reason Eastern initially desired a fuel contract was because the airline planned to take on fuel, and had to have an assured source of supply.

■ If a customer's demands under a requirements contract become excessive, U.C.C. § 2–306 protects the seller and, in the appropriate case, would allow him to refuse to deliver unreasonable amounts demanded (but without eliminating his basic contract obligation); similarly, in an appropriate case, if a customer repeatedly had no requirements at all, the seller might be excused from performance if the buyer suddenly and without warning should descend upon him and demand his entire inventory, but the court is not called upon to decide those cases here.

Rather, the case here is one where the established courses of performance and dealing between the parties, the established usages of the trade, and the basic contract itself all show that the matters complained of for the first time by Gulf after commencement of this litigation are the fundamental given ingredients of the aviation fuel trade to which the parties have accommodated themselves successfully and without dispute over the years.

> "The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error."

*Manhattan Life Ins. Co. of New York v. Wright,* 126 F. 82, 87 (8th Cir. 1903). Accord, *Spindler v. Kushner,* 284 So.2d 481, 484 (Fla.App.1973).

The court concludes that Eastern has not violated the contract.

### III

### COMMERCIAL IMPRACTICABILITY

Gulf's commercial impracticability defenses are premised on two sections of the Uniform Commercial Code specifically §§ 2–614 (F.S. 672.614) and 2–615 (F.S. 672.-615). The former does not require notice while the latter does.

■ Eastern argues that U.C.C. § 2–615 is procedurally inapplicable as Gulf did not give Eastern the notice mandated by the section.

> "(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

At worst, however, Eastern had specific notice of Gulf's intention to rely on this section when Gulf filed its memorandum of law in opposition to Eastern's motion for summary judgment in the summer, 1974. Gulf also raised this section as an affirmative defense when it filed its answer in the fall, 1974 and is therefore entitled to a ruling. Official Comments 4 and 8 to U.C.C. § 2–615 provide:

"4. Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section. (See *Ford & Sons, Ltd., v. Henry Leetham & Sons, Ltd.,* 21 Com.Cas. 55 (1915, K.B.D.).)"

\*   \*   \*   \*   \*   \*

"8. The provisions of this section are made subject to assumption of greater liability by agreement and such agreement is to be found not only in the expressed terms of the contract but in the circumstances surrounding the contracting, in trade usage and the like. Thus the exemptions of this section do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting to be included among the business risks which are fairly to be regarded as part of the dickered terms, either consciously or as a matter of reasonable, commercial interpretation from the circumstances. (See *Madeirense Do Brasil, S.A. v. Stulman-Emrick Lumber Co.,* 147 F.2d, 399 (C.C.A. 2 Cir. 1945).) . . . .."

■ In short, for U.C.C. § 2–615 to apply there must be a failure of a pre-supposed condition, which was an underlying assumption of the contract, which failure was unforeseeable, and the risk of which was not specifically allocated to the complaining party. The burden of proving each element of claimed commercial impracticability is on the party claiming excuse. *Ocean Air Tradeways, Inc. v. Arkay Realty Corp.,* 480 F.2d 1112, 1117 (9th Cir. 1973).

The modern U.C.C. § 2–615 doctrine of commercial impracticability has its roots in the common law doctrine of frustration or impossibility and finds its most recognized illustrations in the so-called "Suez Cases", arising out of the various closings of the Suez Canal and the consequent increases in shipping costs around the Cape of Good Hope. Those cases offered little encouragement to those who would wield the sword of commercial impracticability. As a leading British case arising out of the 1957 Suez closure declared, the unforeseen cost increase that would excuse performance "must be more than merely onerous or expensive. It must be positively unjust to hold the parties bound." *Ocean Tramp Tankers v. V/O Sovfracht (The Eugenia),* 2 Q.B. 226, 239 (1964). To the same effect are *Tsakiroglou and Co. Ltd. v. Noblee Thore G.m.b.H.,* 2 Q.B. 348 (1960), aff'd, A.C. 93 (1962), and *Caparanoyoti & Co., Ltd. v. E. T. Green, Ltd.,* 1 Q.B. 131, 148 (1959). These British precedents were followed by the District of Columbia Circuit, which gave specific consideration to U.C.C. 2–615, Comment 4, in *Transatlantic Financing Corp. v. United States,* 124 U.S.App.D.C. 183, 363 F.2d 312, 319 (1966).

Other recent American cases similarly strictly construe the doctrine of commercial impracticability. For example, one case found no U.C.C. defense, even though costs had doubled over the contract price, the court stating, "It may have been unprofitable for defendant to have supplied the pickers, but the evidence does not establish that it was impossible. A mere showing of unprofitability, without more, will not excuse the performance of a contract."

*Schafer v. Sunset Packing Co.,* 256 Or. 539, 474 P.2d 529, 530 (1970).

Recently, the Seventh Circuit has stated: "The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused". We will not allow a party to a contract to escape a bad bargain merely because it is burdensome". "[T]he buyer has a right to rely on the party to the contract to supply him with goods regardless of what happens to the market price. That is the purpose for which such contracts are made," *Neal-Cooper Grain C. v. Texas Gulf Sulfur Co.,* 508 F.2d 283, 293, 294 (7th Cir. 1974). To the same effect are *American Trading and Production Corporation v. Shell International Marine Ltd.,* 453 F.2d 939 (2d Cir. 1972); *United States v. Wegematic Corp.,* 360 F.2d 674 (2d Cir. 1966); *Whitlock Corp. v. United States,* 159 F.Supp. 602, 606, 142 Ct.Cl. 758 (1958); *Maple Farms, Inc. v. City School District,* 76 Misc.2d 1080, 352 N.Y.S.2d 784 (Sup.Ct. 1974); *Perry v. Champlain Oil Co., Inc.,* 101 N.H. 97, 134 A.2d 65, 67 (1957). *See also, Ballou v. Basic Construction Co.,* 407 F.2d 1137, 1141 (4th Cir. 1969); *Natus Corp. v. United States,* 371 F.2d 450, 456, 178 Ct.Cl. 1 (1967); and *Portland Section of Council of Jewish Women v. Sisters of Charity,* 266 Or. 448, 513 P.2d 1183 (1973).

Gulf's argument on commercial impracticability has two strings to its bow. First, Gulf contends that the escalator indicator does not work as intended by the parties by reason of the advent of so-called "two-tier" pricing under Phase IV government price controls.[7] Second, Gulf alleges that crude oil prices have risen substantially without a concomitant rise in the escalation indicator, and, as a result, that performance of the contract has become commercially impracticable.[8]

The short and dispositive answer to Gulf's first argument under U.C.C. § 2–615, that the price escalation indicator (posting in *Platt's Oilgram Crude Oil Supplement*) no longer reflects the intent of the parties by reason of the so-called "two-tier" pricing structure, is that the language of the contract is clear and unambiguous. The contract does not require interpretation and requires no excursion into the subjective intention of the parties. The intent of the parties is clear from the four corners of the contract; they intended to be bound by the specified entries in *Platt's,* which has been published at all times material here, which is published today, and which prints the contract reference prices. Prices under the contract can be and still are calculated[9] by reference to Platt's publication.[10]

It should be noted that *Platt's Oilgram Crude Oil Supplement* states on its face that its postings since the advent of "two-tier" are basically comparable to the postings historically quoted in *Platt's,* and that postings listed in *Platt's* were price controlled at the time of negotiation and execution of the contract, just as they are today and have been at all times in between. In addition, Gulf's expert witness Mr. Coates testified that oil companies, including Gulf, continue to use "old oil" prices (the prices reported in *Platt's*) for contracts between themselves. Finally, as to the indicator crude (West Texas Sour) there is no showing that the Platt's postings do not reflect the market price for that oil today.

---

7. One tier being "old" price-controlled oil, and the second tier being the unregulated oil.

8. The average price paid by Eastern to Gulf has risen more than 40% over the life of the contract.

9. The parties have stipulated that Eastern has been paying prices mandated by the contract terms.

10. Gulf's contention that the publication of the postings has been "suspended" and therefore that a proviso of Article II of the contract, declaring the consequences of "suspension", has been triggered, is without merit. The Proviso deals, in the clearest of terms, with *Platt's* ceasing to publish either *in toto* or in regard to the specified postings, neither of which is the case here. Furthermore, the proviso contains its own prescription for remedial action in the case of suspension, including notice and substitution of other indicators. Gulf has never attempted to follow the prescribed remedy; thus its argument fails for procedural as well as substantive reasons.

The testimony is in substantial dispute but the court finds, with respect to domestic oil, some 60 percent of Gulf's 1974 domestic production was old oil. With respect to foreign crude oil, domestic prices were considerably lower than imported price at the beginning of the period in question so that the West Texas Sour Crude postings unquestionably did not reflect foreign crude oil postings. In the absence of any evidence to the contrary it may be reasonably inferred that virtually all transactions in West Texas Sour Crude Oil take place at the postings reflected in *Platt's*, since most of the production in that field is "old" oil.

With regard to Gulf's contention that the contract has become "commercially impracticable" within the meaning of U.C.C. § 2–615, because of the increase in market price of foreign crude oil and certain domestic crude oils, the court finds that the tendered defense has not been proved. On this record the court cannot determine how much it costs Gulf to produce a gallon of jet fuel for sale to Eastern, whether Gulf loses money or makes a profit on its sale of jet fuel to Eastern, either now or at the inception of the contract, or at any time in between. Gulf's witnesses testified that they could not make such a computation. The party undertaking the burden of establishing "commercial impracticability" by reason of allegedly increased raw material costs undertakes the obligation of showing the extent to which he has suffered, or will suffer, losses in performing his contract. The record here does not substantiate Gulf's contention on this fundamental issue.

Gulf presented evidence tending to show that its "costs" of crude oil have increased dramatically over the past two years.

However, the "costs" to which Gulf adverts are unlike any "costs" that might arguably afford ground for any of the relief sought here. Gulf's claimed "costs" of an average barrel of crude oil at Gulf's refineries (estimated by Gulf's witness Davis at about $10.00 currently, and about $9.50 during 1974) include intra-company profits, as the oil moved from Gulf's overseas and domestic production departments to its refining department. The magnitude of that profit was not revealed.

With respect to Gulf's foreign crude oil "costs", the record shows that at the very time Gulf was in the process of repudiating its contract with Eastern (January 1974), Gulf's profit margin on foreign crude oil brought into the United States (Cabindan and Nigerian) was approximately $4.43 to $3.88 per barrel compared with profits of $0.92 and $0.88 respectively, one year earlier.[11] That margin may now have declined, but the record discloses that Gulf's overseas subsidiaries have enjoyed substantial profits from crude oil transactions and that those profits are included in the "average" crude oil "costs" of which Gulf now complains. The "transfer" prices at which Gulf "sells" its foreign oil to its domestic subsidiaries are set by a pricing committee in Gulf's Pittsburgh home office. Intra-company profit can be and is allocated among those 400-plus corporate subsidiaries of Gulf, largely through the transfer price device, to optimize overall benefit to the corporation, as documents from the committee reveal. Internal memoranda from the pricing committee introduced into evidence showed for instance that the committee had before it the view of one of its tax experts that every $1 increase in Nigerian oil prices resulted in a 50 to 90 cent benefit to the company; other memoranda describe how profits might be assigned, through intercompany sales, to various other offshore subsidiaries to obtain favorable tax treatment for the purpose of maximizing the advantages to the corporation for the benefit of the parent corporation. Similarly, there are memoranda reflecting a policy of charging the highest prices possible to the United States.

In like manner, the "per barrel" cost calculations which Gulf introduced at trial reflect "in house" profits from Gulf's domestic production. During the discovery process, Gulf developed for Eastern certain

---

11. Gulf's international oils expert, Mr. Blackledge testified that foreign oil costs were up

four-fold during 1973–74 but Gulf's profits also went up four-fold in that period.

"cost" figures. Those data show that a Gulf-produced barrel of domestic crude oil is reflected on Gulf's books at a cost of approximately $2.44 for the nine-month period ending September 30, 1974. Yet, for purposes of computing an overall average "cost" to Gulf of a barrel of crude oil for trial purposes (estimated by Gulf's economist witness Davis on the stand at about $9.50 for that period), Gulf used, not the $2.44 actual booked cost, but a "transfer" price, equal to "postings" and including intra-company profit. To the extent "old oil" postings are reflected in the domestic oil "transfer price", the intra-company profit would be on the order of $2.76 per barrel, measured against the $5.20 posting listed in *Platt's* for West Texas Sour Crude; "new" oil "transfer prices" would include an even larger profit margin. Gulf estimated that some 70 percent of domestic oil going into Gulf's refineries was its own proprietary production.

Again, these are not the kinds of "costs" against which to measure hardship, real or imagined, under the Uniform Commercial Code. Under no theory of law can it be held that Gulf is guaranteed preservation of its intra-company profits, moving from the left-hand to the right-hand, as one Gulf witness so aptly put it. The burden is upon Gulf to show what its real costs are, not its "costs" inflated by its internal profits at various levels of the manufacturing process and located in various foreign countries.

No criticism is implied of Gulf's rational desire to maximize its profits and take every advantage available to it under the laws. However, these factors cannot be ignored in approaching Gulf's contention that it has been unduly burdened by crude oil price increases.

No such hardship has been established. On the contrary, the record clearly establishes that 1973, the year in which the energy crises began, was Gulf's best year ever, in which it recorded some $800 million in net profits after taxes. Gulf's 1974 year was more than 25% better than 1973's record $1,065,000,000 profits were booked by Gulf in 1974 after paying all taxes.[12]

For the foregoing reasons, Gulf's claim of hardship giving rise to "commercial impracticability" fails.

But even if Gulf had established great hardship under U.C.C. § 2–615, which it has not, Gulf would not prevail because the events associated with the so-called energy crises were reasonably foreseeable at the time the contract was executed. If a contingency is foreseeable, it and its consequences are taken outside the scope of U.C.C. § 2–615, because the party disadvantaged by fruition of the contingency might have protected himself in his contract, *Ellwood v. Nutex Oil Co.,* 148 S.W.2d 862 (Tex.Civ.App.1941).

The foreseeability point is illustrated by *Foster v. Atlantic Refining Co.,* 329 F.2d 485, 489 (5th Cir. 1964). There an oil company sought release from a gas royalty contract because the royalty provisions of the contract did not contain an escalation clause, with the result that the oil company came to receive a far smaller share of the royalties than it would then have been able to obtain on the market. Citing *Ellwood, id.,* with approval, the Fifth Circuit answered the oil company's argument as follows:

"(O)ne who unconditionally obligates himself to do a thing possible of performance, must be held to perform it (citing cases); and though performance, subsequent to the contract, may become difficult or even impossible, (this) does not relieve the promisor, and particularly where he might have foreseen the difficulty and impossibility (citing cases)."

The record is replete with evidence as to the volatility of the Middle East situation, the arbitrary power of host governments to control the foreign oil market, and repeated interruptions and interference with the normal commercial trade in crude oil. Even without the extensive evidence present in

---

12. Gulf stipulated in the parties' pretrial stipulation that it had the capability to perform the contract.

the record, the court would be justified in taking judicial notice of the fact that oil has been used as a political weapon with increasing success by the oil-producing nations for many years, and Gulf was well aware of and assumed the risk that the OPEC nations would do exactly what they have done.

With respect to Gulf's argument that "two-tier" was not "foreseeable", the record shows that domestic crude oil prices were controlled at all material times, that Gulf foresaw that they might be de-controlled, and that Gulf was constantly urging to the Federal Government that they should be de-controlled. Government price regulations were confused, constantly changing, and uncertain during the period of the negotiation and execution of the contract. During that time frame, high ranking Gulf executives, including some of its trial witnesses, were in constant repeated contact with officials and agencies of the Federal Government regarding petroleum policies and were well able to protect themselves from any contingencies.

Even those outside the oil industry were aware of the possibilities. Eastern's principal contract negotiator advised his superior in recommending this contract to him:

"While Gulf is apparently counting on crude price increases, such increases are a fact of life for the future, except as the government may inhibit by price controls, therefore all suppliers have such anticipation."

"1975 is the year during which the full effect of energy shortages will be felt in the United States according to most estimates."

Knowing all the factors, Gulf drafted the contract and tied the escalation to certain specified domestic postings in *Platt's*. The court is of the view that it is bound thereby.

The court is further of the opinion that U.C.C. § 2–614(2) is not applicable to this case. It provides:

"(2) If the agreed means or manner of payment fails because of domestic or foreign governmental regulation, the seller may withhold or stop delivery unless the buyer provides a means or manner of payment which is commercially a substantial equivalent. If delivery has already been taken, payment by the means or in the manner provided by the regulation discharges the buyer's obligation unless the regulation is discriminatory, oppressive or predatory."

■ It is clear that this section dealing with "means or manner of payment" speaks, by way of illustration, to the blocking by governmental interference with the contemplated mode of monetary exchange. (e. g., when a contract provides for payment in gold specie and the government subsequently forbids payment in gold). No such issue appears in the case at bar and U.C.C. § 2–614 is inapposite here.

## IV

### REMEDY

Having found and concluded that the contract is a valid one, should be enforced, and that no defenses have been established against it, there remains for consideration the proper remedy.

■ The Uniform Commercial Code provides that in an appropriate case specific performance may be decreed. This case is a particularly appropriate one for specific performance. The parties have been operating for more than a year pursuant to a preliminary injunction requiring specific performance of the contract and Gulf has stipulated that it is able to perform. Gulf presently supplies Eastern with 100,000,000 gallons of fuel annually or 10 percent of Eastern's total requirements. If Gulf ceases to supply this fuel, the result will be chaos and irreparable damage.

■ Under the U.C.C. a more liberal test in determining entitlement to specific performance has been established than the test one must meet for classic equitable relief. U.C.C. § 2–716(1); *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F.Supp. 923, 932 (N.D.Cal.1970), *appeal dismissed per curiam* 443 F.2d 1364 (9th Cir. 1971).

It has previously been found and concluded that Eastern is entitled to Gulf's fuel at the prices agreed upon in the contract. In the circumstances, a decree of specific performance becomes the ordinary and natural relief rather than the extraordinary one. The parties are before the court, the issues are squarely framed, they have been clearly resolved in Eastern's favor, and it would be a vain, useless and potentially harmful exercise to declare that Eastern has a valid contract, but leave the parties to their own devices. Accordingly, the preliminary injunction heretofore entered is made a permanent injunction and the order of this court herein.

## CONCLUSIONS

For the foregoing reasons, the court makes the following ultimate findings of fact and conclusions of law:

1. The court has jurisdiction over the parties and the subject matter of this litigation.

2. The contract at issue is a valid requirements contract.

3. The contract was performed by the parties in accordance with its terms up to and including December 31, 1973, and Eastern has continued so to perform since that time.

4. On December 31, 1973, Gulf breached the contract by declaring it no longer to be in effect.

5. The contract is not lacking in mutuality nor is it commercially impracticable, and Eastern has performed its obligations thereunder.

6. Eastern is entitled to enforcement of the contract, and the preliminary injunction heretofore issued, requiring specific performance according to the terms of the contract, be and the same is hereby made permanent.

DONE and ORDERED in chambers at the United States Courthouse for the Southern District of Florida, Miami, Florida this 20th day of October, 1975.