**FLORIDA POWER AND LIGHT COMPANY, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

Civ. A. No. 75–0677–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 8, 1984.

Alvin B. Davis, Dwight Sullivan, Steel, Hector & Davis, Paul J. Bonavia, Miami, Fla., for plaintiff.

John S. Battle, Jr., McGuire, Woods & Battle, Richmond, Va., Robert F. Pugliese, Pittsburgh, Pa., Ira M. Millstein, Weil, Gotshal & Manges, New York City, Floyd, Pearson, Richman, Greer & Weil, P.A., Miami, Fla., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

This matter was tried to the Court. In an opinion issued June 25, 1981, the Court made extensive factual findings concluding that Westinghouse was liable for breaching its contract to remove and dispose of the spent fuel generated at Florida's Turkey Point nuclear reactors pursuant to a fuel contract that Westinghouse had entered into with Florida in 1966.

Florida, in its suit, was seeking an award of damages for the amount it had spent to the date of trial in accommodating the spent fuel accumulating at the reactor sites through a "re-racking" of its spent fuel storage pits at those sites, and in addition was seeking an order directing Westinghouse to specifically perform its obligation to remove the fuel. The Court, after finding Westinghouse liable, determined that rather than attempt to order a specific remedy, it would give the parties a further opportunity to attempt to negotiate a solution to the question of how Westinghouse could best fulfill its obligation to remove the spent fuel. Short of that, the parties would be given an opportunity to provide the Court certain additional information on what the possibilities were for removing the fuel, so as to assist the Court in determining the appropriate remedy.

The parties made a good faith effort to negotiate the remedy but failed. In October, 1983, the parties returned for the purpose of supplying the Court with additional information to aid the Court's remedy determinations. Florida sought damages of

roughly $87 million altogether, not including the value of certain work that Westinghouse had already agreed to do on the interim storage facilities at Turkey Point. In the meanwhile, Westinghouse had moved for a reconsideration of the Court's 1981 liability determination.

The Court issued a decision in January of 1984 that was intended to finally resolve all the then outstanding issues in this litigation. Florida has now moved for reconsideration of the 1984 decision on a number of grounds. One is designated as "unfair surprise."

The Court is satisfied that Florida has been well aware of the range of issues Westinghouse expected to be arguing in this remedy/reconsideration round and accordingly that this claim (which was not pressed at oral argument) is not well-taken.

Nevertheless, Florida has persuasively suggested that the Court's 1984 decision was, in at least some significant regards, inconsistent with its 1981 decision and that the inconsistencies arise from errors of law in the later decision. In the hopes of disposing of all outstanding issues, the Court has determined to grant Florida's motion to reconsider, to fully review the evidence introduced at the 1979 liability trial and at the 1983 remedy hearing, and upon conclusion thereof to make a final determination as to the appropriate remedy.

### Factual Background

The Court's 1981 decision thoroughly set out the facts before the Court at that time. *See* 517 F.Supp. 440 (E.D.Va.1981). At this point the Court need only address developments since the 1981 decision, and facts that Westinghouse has cited as supporting reconsideration of the findings in the 1981 decision.

### A. Developments since 1979

At the time the parties originally came before the Court on this matter, two facts hovered over the Court and the litigants in such a way as to make the remedy determination both difficult and pressing. On the one hand, Florida represented to the Court—and the Court is satisfied that it

was Florida's sincere belief—that if the spent fuel were not promptly removed from its reactor sites, the reactors would be forced to shut down, at a cost of a half-million dollars daily for substitute power. On the other hand, it appeared that there was not any means then available or likely to be available in the future whereby the spent fuel could be removed and disposed of.

These two facts had left the parties facing a dire future and the Court frustrated in its efforts to do complete justice. Fortunately the facts which were the basis for that set of circumstances are no longer accurate. First, further technological study has revealed that it is indeed possible to "re-rack" the Turkey Point spent fuel storage pits a second time, so as to provide sufficient on-site storage for all the spent fuel that the reactors will discharge over its useful life. This means that there is no chance that the reactors will be forced to shut down, and consequently no prospect that anyone will expend a half-million dollars daily on substitute power. Florida and Westinghouse have agreed that such a second re-racking at Turkey Point is in order, and Westinghouse has agreed to do the necessary work at no cost to Florida.

Second, the United States Government ("the Government") has finally taken what appear to be firm steps toward creating a permanent disposal site for nuclear spent fuel. The Nuclear Waste Policy Act of 1982 ("NWPA"), which became law in early 1983, provides for locating and constructing a government-owned, permanent, deep-burial repository for spent fuel. 42 U.S.C. § 10101 *et seq.* The Act sets out a specific timetable culminating in the opening of the site for receipt of spent fuel in 1998.

The Act provides for negotiation of fixed-price contracts to be entered into currently between "owners and generators" of spent fuel and the Department of Energy ("DoE"), pursuant to which DoE agrees to take title to the spent fuel in exchange for a negotiated fixed fee. 42 U.S.C. § 10222(a)(1). The significance of having

DoE take title to the spent fuel is that the contracting party can thereby rid itself of any further financial responsibility in connection therewith, and particularly of risks associated with the operation of the government repository.

The NWPA required utilities using nuclear fuel to enter into such contracts with DoE promptly as a condition to having their licenses renewed, which Florida has accordingly done. Florida actually executed at least two such contracts, one for the ten years' worth of spent fuel that is the subject of this dispute and one for the spent fuel that Florida's reactors will generate during their 20 years' worth of useful life remaining after the end of the Westinghouse fuel contract. The DoE's disposal fee for the disputed spent fuel was fixed at roughly $70 million. The NWPA mandates that this fee be designed to cover a proportionate share of the costs of the permanent repository and no more, and no party has suggested that the $70 million is unduly high by that standard.

The NWPA abandons for the most part the federal government's earlier policy, announced in 1977, of seeking to construct government-owned away-from reactor ("AFR") storage facilities in which to keep spent fuel in the interim until the permanent repository becomes available. The NWPA instead encourages interim storage at the reactor sites, through the use of techniques such as re-racking, which Florida is employing at Turkey Point. It provides for only a limited amount of government-owned AFR storage, for spent fuel from reactors at which further on-site storage is not feasible.

Westinghouse suggests that the NWPA also mandates that the costs of the permanent repository be passed on to nuclear electricity ratepayers. The Court, though once of a similar opinion, is not convinced. In fact, the legislative history indicates that the financing scheme of imposing a

disposal fee on "owners and generators" of spent fuel was chosen over several other proposals, including one in which a "generation fee" would have been assessed directly to nuclear electricity ratepayers. See DX–SF–467,[1] *Congressional Budget Office Study on Financing Radioactive Waste Disposal,* September 1982.

■ Westinghouse is accurate in its contention that the legislation contemplates that the "generators and owners" of spent fuel would typically be utilities and that the utilities would be allowed to pass the expense on to their ratepayers. However, the statutory language was not intended to alter whatever responsibility a party such as Westinghouse might have to a utility and/or its ratepayers, as the following language from the Congressional debates on the bill show:

> Mr. GORE: .... I want to confirm that an understanding we had in the Committee on Energy and Commerce is shared generally by Congress as to the effect of this legislation on contractual commitments to dispose of spent nuclear fuel. Page 85 of that committee's report on H.R. 6598 states generally that *nothing in the bill ... would relieve any other parties who may have contracted with such generators or owners to be responsible for some or all disposal costs, from any of their contractual obligations.*
>
> Is that correct?
>
> Mr. UDALL ... that is correct, as far as our committee is concerned.
>
> Mr. OTTINGER. And it is correct as far as our committee is concerned.

Congressional Record Vol. 128 (1982), September 30, 1982, H8171 (emphasis added).

Another legal development, which the parties have not highlighted presumably because its practical significance is minimal despite its apparent moment, is that President Reagan in 1981 lifted the ban on commercial reprocessing that President Carter

---

1. In the trials, defendants' exhibits were numbered "DX–SF–_____." and plaintiffs' exhibits were numbered "FPL–SF–_____." The "SF" stands for "spent fuel" and distinguishes these exhibits from the exhibits submitted in the uranium litigation with which this dispute was originally tried.

had imposed in 1977. As the Court's 1981 decision makes clear, Westinghouse had relied on President Carter's reprocessing ban as a major part of its commercial impracticability argument. The ban, however, turns out to have been merely one manifestation of intense political opposition to reprocessing on environmental and safety as well as national security grounds, and hence the opposition did not disappear when the ban did.

It would appear that the opposition is not so much to reprocessing, as such as to the plutonium produced in the process. Reprocessing would convert spent fuel into separate quantities of uranium, plutonium, and radioactive wastes. Proponents of nuclear technology hoped that the plutonium, as well as the recovered uranium, could profitably be recycled as new fuel for the same or other reactors.

Other vocal participants in debates on nuclear energy have contended that the presence of the plutonium is a cost rather than a benefit. They claim that plutonium, which is a highly volatile material, poses safety risks (e.g. of accidental leakage), as well as national security risks, that counsel against allowing it to become available in large quantities in private hands.

In light of this vocal opposition, even without a presidential ban, the licensing process for any new commercial reprocessing venture would be long and expensive at best. Additionally, new safety regulations would probably require technological safeguards and physical surveillance for the plutonium, and these additional costs could make commercial reprocessing exceedingly expensive even if it could be licensed. Not surprisingly, in this light, none of the corporations that might have been expected to enter the business once the ban was lifted have expressed any interest in doing so, and experts in the field have predicted that, absent federal legislation to provide financial support and insurance against further fluctuations in government policy, no further business venture into commercial reprocessing is likely to take place.

### B. The Experts' Reports

In response to the Court's inquiries on remedy options, both Westinghouse and Florida hired experts to explore what if anything could be done with the disputed spent fuel. The experts, quite appropriately, did not focus on what theoretically could have been done had proper steps been taken at some earlier time, nor did they concern themselves with how the cost of the possible solutions would be paid. Rather, they focused on the practical question of what options, if any, were available or could reasonably be made available at present.

Westinghouse submitted its experts' report as evidence at the remedy hearing. DX–SF–437. Florida did not do so, but the Court's understanding is that the experts on both teams were in agreement on the major points addressed in any event. The experts were in constant consultation with each other, and the Westinghouse report purports to summarize the Florida experts' conclusions as well as their own. The Court accepts their summaries thereof as accurate.

The experts' key conclusion is that there is currently nowhere to which the disputed spent fuel could lawfully be removed. The parties have now stipulated to this fact. The experts found that the most—indeed the only—currently feasible option for dealing with the spent fuel is to keep it at the Turkey Point reactor sites in re-racked storage pools until the permanent federal repository becomes available, at which time it will be delivered to that repository. The total cost of this solution will be almost $100 million. This sum consists of the $70 million disposal fee to DoE and roughly $13 million costs-plus-interest for the first re-racking, both of which Florida seeks to have Westinghouse pay, and roughly $12 million in costs for the second re-racking that Westinghouse has agreed to perform.[2]

2. See 517 F.Supp. 440 at 448 wherein the court found Florida had expended $9,473,242.04 in the first re-racking. See also p. 460 wherein the court held Florida was entitled to reimbursement of this expenditure.

■ This conclusion alone resolves, in the negative, the question of whether the Court can or should order Westinghouse specifically to perform its promise to remove at the present time. However, some further explanation of the bases for this conclusion may aid the determination of what if any damages Westinghouse must pay Florida for the costs incurred and to be incurred for the interim storage at Turkey Point and for disposal in the permanent federal repository.

The experts' conclusion that the fuel could not lawfully be removed was not based on legal or technical difficulties with transporting the spent fuel away from the reactor sites. While local or state laws may make transporting spent fuel expensive and/or impossible in some locations, and environmental/safety considerations may counsel minimizing such transport, there is no general legal ban on physically removing the spent fuel, nor are there technical barriers to so doing. This is as true in 1984 as it was in 1979. The problem lies, instead, with finding a place that could lawfully take the spent fuel once removed. Here, too, there is no general legal ban against, or technical difficulty with, AFR storage sites. However, economic, licensing, and timing considerations effectively eliminate all options other than on-site storage at Turkey Point.

At the beginning of their study, the Florida and Westinghouse experts conferred with each other and divided the possible alternatives into four classes for purposes of investigation, as follows: (1) potential for use of existing off-site storage facilities; (2) potential for development of a new offsite (AFR) facility; (3) expansion of the capacity of Florida's existing on-site storage facilities (through re-racking, etc.); and (4) construction of a new on-site storage facility.

In exploring existing off-site facilities, the experts searched domestic and foreign possibilities, and explored both government and private-owned sites. Their exploration of foreign possibilities included reprocessing facilities as well as storage. Their conclusion was that no off-site facilities are presently available to accept the Turkey Point spent fuel, nor will any become available before the date, sometime in the late 1980's, at which Florida's existing on-site storage facilities are predicted to be filled to their maximum capacity, absent the agreed upon second re-racking.

While the experts found one or more domestic storage facilities and at least one foreign commercial reprocessing facility that were available in the physical sense, all of these had their full capacity over the relevant period tied up on contractual obligations with other entities or were for other reasons unwilling to accept the Turkey Point spent fuel. One such facility worth noting is the GE facility at Morris, Illinois. This facility was originally licensed and constructed as a reprocessing plant, but when it became apparent in the early 1970's that it was not economically practical to operate the plant as such, GE converted it into a storage facility. GE has used the Morris facility since 1971 to store spent fuel only from customers with whom GE had prior reprocessing and fuel cycle service contracts. Because neither Westinghouse nor Florida had such a contract with GE, GE will not accept the Turkey Point spent fuel.

As to the existing foreign reprocessing facilities, the Westinghouse experts concluded that in addition to the fact that their full capacity is already committed for at least the next 13 to 15 years, exporting the spent fuel and transporting it such distances would entail prohibitive regulatory and political problems.

The experts' conclusion as to the potential for new off-site facilities was just as bleak. There are currently no plans for any such facilities, except the government's plans pursuant to the NWPA for a limited capacity site for utilities that cannot feasibly store their spent fuel on-site.

The experts also considered the feasibility of Westinghouse or Florida developing and constructing an AFR facility. They concluded that a new AFR would be very expensive, and that locating a site for it

would be exceedingly difficult because of political opposition to such facilities. Additionally, the NWPA expresses a government policy of encouraging new on-site storage, rather than private AFR's. The government policy does not mean that an AFR would automatically be unlicensable, but in combination with the fact that re-racking could serve the same needs at lower cost and with less political controversy, it would make licensing most difficult. The experts also agreed that in any event a new AFR could not be licensed and built in time to receive fuel before Florida's existing storage facilities reached their full capacity in 1989.

The various on-site alternatives considered need not be described in detail. Briefly, in light of technical, economic and political considerations, the experts concluded that the best on-site solution was a re-racking of the existing storage pools at Turkey Point. Having concluded that it is so far superior on these grounds, all of which would play a part in licensing determinations, the experts further concluded that any on-site option other than re-racking would probably be unlicensable.

*C. Facts Urged in Support of Westinghouse's Reconsideration Arguments*

Westinghouse's proposed findings of fact submitted for the October 1983 remedy hearing include a number of factual propositions that would entail reconsideration or reinterpretation of findings made in the 1981 decision. This section addresses those propositions only insofar as the Court has deemed it necessary to give additional consideration to the issues they address.

(i) *Westinghouse urges the Court to find that it never was possible for Westinghouse to have removed any of the Turkey Point spent fuel, because at no point since the first batch of spent fuel was ready for removal in 1975 has there been any place to which the spent fuel could lawfully have been removed.*

Westinghouse has not proved this assertion to the Court's satisfaction, at least not without qualifications. Westinghouse takes an inappropriately static approach to

these issues, by focusing on an overly narrow time period and by overlooking the extent to which its own activity or lack thereof helped shape the circumstances that unfolded. Westinghouse convincingly makes the case that by 1975 there was in fact no place available that could and would accept the Turkey Point spent fuel. This fact does not address in a meaningful manner the Court's 1981 finding that "the unavailability of reprocessing or storage for Florida's spent fuel prior to 1977 is clearly attributable, at least in part, to Westinghouse's own less than zealous attempts to obtain a facility." 517 F.Supp. at 455. Reprocessing and/or storage facilities cannot be expected to spring out of the ground at the moment they are first needed. Licenses must be obtained, buildings constructed, etc. Not surprisingly, commercial operators of such facilities may wish to book contracts with their potential customers several years in advance. Consequently, the relevant question is whether Westinghouse could have made a reprocessing or storage facility available in 1975 if it had taken the necessary steps in the years preceding.

Westinghouse's new evidence and arguments have not tilted the balance in Westinghouse's favor on this question. Nor do the experts' reports add anything to Westinghouse's arguments on this point. As discussed *supra*, their approach was appropriately forward-looking, and they do not tell us anything about what might have been available had various steps been taken at some earlier time. Additionally, Westinghouse has not challenged the Court's 1981 finding that Westinghouse failed to act diligently in the early 1970's to secure a reprocessing and/or storage facility for the Turkey Point spent fuel.

The only suggestion has been that the results would have been the same even if Westinghouse had acted diligently. The AGNS facility would, so the argument goes, still have failed as a reprocessing plant, and its owners would still not have converted it to a storage facility for its former reprocessing customers.

Westinghouse has not satisfied the Court that this is completely so. The AGNS facility, as built for reprocessing, had existing storage capacity in 1975 which would have been more than enough for the spent fuel disputed here. Had Westinghouse pressed its contract negotiations with AGNS more aggressively, or had it sought to enforce what its witnesses claimed was a lawful contract whereby AGNS agreed to remove and reprocess the disputed spent fuel, at least some of this space could have been made available to Westinghouse. While other customers may have successfully insisted that the space be shared with them, it is reasonable to conclude that a portion of it would have been allocated to Westinghouse.

Indeed, the AGNS facility could conceivably have been expanded to serve as an AFR storage facility for a much larger quantity of spent fuel, making space available for all of Westinghouse's spent fuel as well as that of AGNS's other customers, as was done at GE's Morris, Illinois facility. With the exception of complications from local laws in some states regarding the transport of spent fuel, the GE facility is successfully operating as an AFR today, accepting spent fuel from the customers who had originally contracted with it for reprocessing.

Westinghouse argues that the AGNS facility could not have been made available as an AFR because it would have been unlicensable as such. This argument carries little weight with the Court. The Nuclear Regulatory Commission ("NRC") had licensing procedures pursuant to which the GE facility was licensed as a storage facility in the mid-1970's, 10 C.F.R. Part 72, and the NRC now has on its books procedures designed specifically for the licensing of such facilities. 10 C.F.R. Part 72. The explanation as to why this and other options would be unlicensable springs not from any firm legal obstacle, but from the proposition that the NRC, and its predecessor the Atomic Energy Commission ("AEC"), would be unwilling to license this expensive and environmentally costly option so long as the relatively cheap and easy alternative of re-racking at Turkey Point is available.

This may be an accurate statement of the NRC's licensing processes, but it is not equivalent in the Court's view to a firm legal barrier that should excuse Westinghouse from its contractual obligations. According to Westinghouse, the NRC would insist, in effect, that Florida allow Westinghouse to co-opt Florida's on-site property so as to use the cheapest form of interim storage available for Westinghouse's spent fuel, i.e., re-racking. Assuming that this is a correct statement of NRC policy, it works only to Westinghouse's advantage, saving it from the expensive AFR option and making the cheaper re-racking alternative available to it. The Court fails to see how this fact compels any further adjustment in Westinghouse's favor, in the form of a ruling that would force Florida to pay either the re-racking or the ultimate disposal costs of the spent fuel. The Court's prior conclusions in this regard were in error.

However, although the AGNS facility could conceivably have been expanded, the evidence suggests that any attempt to expand the AGNS facility into a full-scale AFR facility would have met intense and possibly insurpassable political opposition. Recent legislation in South Carolina, in which state the AGNS facility is located, conditions the establishment of an AFR facility in that state on the approval of both houses of the state legislature. *See* DX–SF–437, p. I–26. Indeed, proposals for AFR's nationwide have consistently been met with intense local opposition. Westinghouse points out that no one has ever intentionally built an AFR facility anywhere. While this latter fact is probably in large part due to the relative expense of the AFR option vis-a-vis re-racking rather than to external obstacles, political opposition clearly has been influential as well.

In this light, the Court is not prepared to find that Westinghouse could have forced AGNS to convert its facility to a full-scale AFR that could have accepted the Turkey Point spent fuel throughout the life of the 1973–1983 contract between Florida and

Westinghouse. Nor is the Court prepared to find that Westinghouse could have built its own AFR to have served that purpose. It would be purely speculative to reach a conclusion in either direction on these two points.

However, Westinghouse has not disturbed the Court's 1981 finding that had Westinghouse acted with diligence, it could have removed some portion of the spent fuel to the existing storage space at the AGNS facility or to similar space at a number of other sites summarized in the experts' report.

More importantly, the Court is satisfied that Westinghouse can now ultimately meet its obligation in reference to removal and disposal of the spent fuel as a consequence of Florida's having contracted with the DoE for its removal to the permanent federal repository. As will be addressed *infra*, Westinghouse's failure and/or inability to remove in timely fashion does not necessarily relieve it of the obligation to remove altogether, or as the Court will decree, reimburse Florida for its cost in connection therewith.

As the Court understands it, there would have been no legal or other obstacle had Westinghouse sought to contract with the DoE in Florida's stead for the removal and disposal of the disputed spent fuel. Indeed, if Westinghouse had succeeded in removing the spent fuel to an interim AFR facility, Westinghouse would have been required to contract with the DoE for its ultimate removal to the federal repository. Accordingly, the Court is satisfied that Westinghouse had as full an opportunity to contract for removal and disposal of the spent fuel to the federal repository as did Florida.

(ii) *Westinghouse urges the Court to find that political rather than commercial factors were responsible for the demise of reprocessing, and that while Westinghouse may have assumed the commercial risks when it signed the contract, it did not assume the political risks, because they were unforeseeable.*

These suggestions require further exploration first of the reasons that reprocessing has failed, and second of the foreseeability of those reasons in 1965. It is certainly true that the 1977 Carter ban and the Ford deferral on reprocessing which occurred in 1976 were unforeseeable. Both actions were in response to a political determination that the increased availability of plutonium would entail an unacceptable risk of nuclear weapons materials slipping into unfriendly hands. The Government's policies of the 1960's were clearly based on a different evaluation of this concern.

However, the evidence indicates that plans for commercial reprocessing facilities were running into complications well before President Ford's 1976 declaration, and also that no such plans have been revived since the ban was lifted in 1981. A number of factors contributed to the failure of reprocessing in the periods prior to 1976 and subsequent to 1981. Categorizing those factors as purely political or purely commercial is not an easy task.

The commercial reprocessing plant at West Valley, New York, which had been open from 1966 to 1972, closed in 1972 for modifications and expansion. While it was closed, its owners assessed its future commercial viability and determined that it would be too expensive to operate in light of new, more stringent safety regulations for reprocessing and the handling of plutonium.

GE had chosen to try a new, experimental method of reprocessing in its Morris facility; its reprocessing plans were abandoned in 1973 when the new method proved unworkable. The AGNS facility being constructed at Barnwell, South Carolina (which was the only other reprocessing plant beyond the hopeful stage at that time) was originally scheduled to have been completed in late 1974, but construction delays pushed that schedule back to 1976, and then in 1976 its licensing application was delayed pending completion of the so-called "GESMO" proceedings. *See National Resources Defense Council v. NRC*, 539 F.2d 824, 846 (2nd Cir.1976).

The GESMO study was the NRC's attempt to produce a single general environmental impact statement on the use of recycled plutonium in fuels for nuclear power reactors. The scope of the GESMO study included the entire "back-end" of the fuel cycle, including reprocessing as well as plutonium recycle. The study was to address a wide range of potential impacts, including the health, environmental, and safety effects of reprocessing, of transporting plutonium, and of other steps in the recycle process.

The GESMO study also was to include an analysis of alternative programs for safeguarding plutonium—that is, preventing its illicit use for nuclear explosives or toxic disposal. *See* DX–SF–454; DX–SF–455 p. ES–2. But this safeguards issue was just one of a number that the study was to address.

The GESMO proceedings were suspended indefinitely following the 1977 ban on reprocessing. Westinghouse intimates, in attempting to establish that the 1977 ban cut short otherwise promising plans for reprocessing, that absent the ban, the GESMO proceedings would have ended in results favorable to plutonium recycle. This is by no means clear. Although preliminary NRC staff reports had reached favorable conclusions, other governmental entities had publicly expressed doubts about those reports, and the public hearings and evaluation process was still underway when the ban was issued. To speculate as to what the ultimate outcome would have been would be futile.

Now that the 1977 ban has been lifted, the reinitiation and completion of the GESMO proceedings stand as a key obstacle to the re-kindling of commercial interest in reprocessing. At the very least, those proceedings would yield safety regulations and safeguard requirements for reprocessing and plutonium recycle that would be exceedingly expensive or even prohibitively costly.

In this light, the Court is satisfied that the 1977–1981 ban on reprocessing was just one of the obstacles that blocked the development of commercial reprocessing.

Additionally, the Court is satisfied that the obstacles to reprocessing that developed before 1976 were reasonably foreseeable in 1965. The GESMO proceedings or their substantial equivalent were entirely foreseeable, if not a certainty, as was the prospect that stringent safety regulations and/or technological problems might contribute greatly to the cost of reprocessing.

These conclusions are based on, *inter alia,* the clear evidence that it was foreseeable from the beginning of the private nuclear power industry that the government, through the AEC, would set and enforce safety regulations for the industry. This was part of the announced policy, and a determination that the AEC would be able to do so successfully was a condition of the government's decision to turn the industry over to private hands. When the AEC submitted a legislative proposal to Congress in 1963 to eliminate mandatory government ownership of "special nuclear material," it made specific public assurances that the enactment of the proposed law would not derogate the AEC's authority to control such material "and other materials and facilities under its jurisdiction or to exercise safeguard rights provided under agreements for cooperation with other countries." DX–SF–445, *AEC Annual Report to the Congress for 1963,* p. 17.

It was also clear from the first that the AEC's safety concerns extended to the back-end of the fuel cycle, including transport and disposal of radioactive materials, as well as to reactor operation, and that safety concerns would play a major role in the development of *all* facets of the industry. These facts are evidenced in the following representative quotes from AEC Annual Reports for the mid-1960's:

Along with the development of technology for nuclear reactors is the concomitant development of safeguards in the design, construction and operation of nuclear reactors and devices for land, sea, and space purposes. These safety aspects extend *from the selection of mate-*

*rials through operational procedures to disposal of radioactive materials .... reactor technology is inextricably bound with all aspects of public safety.*

DX–SF–445, *AEC Annual Report to the Congress for 1963,* p. 163 (emphasis added). And again:

The goal of the [AEC's] regulatory program is to ensure through a program of licensing and regulation that the use, *transport and disposal* of radioactive materials, *and the operation of reactors and other nuclear facilities* are conducted in a manner consistent with public health and safety.

DX–SF–447, *AEC Annual Report to the Congress for 1965,* p. 297 (emphasis added).

The Court is also satisfied that it was known that safety regulations might change, and that the AEC would not hesitate to enforce expensive safety requirements, even retroactively. Safety criteria had not yet been fixed in the mid-1960's, and that the AEC made it known that such criteria would be developed and amended on an ongoing basis, "as part of the Commission's continuing program of modifying its regulatory controls on the basis of experience and new knowledge." DX–SF–445, *AEC Annual Report to the Congress for 1963,* p. 11.

The AEC made no commitment that it would allow operations if certain fixed criteria were met or that it would offer indemnification if compliance with safety conditions caused unanticipated loss to the industry. The AEC's Annual Report for 1965 noted that a panel of persons from outside the Government had been appointed to conduct a comprehensive study of the AEC's regulatory program. The panel urged intensified efforts to develop criteria, standards, and codes for the safety evaluations of private nuclear power ventures. The AEC implicitly acknowledged that this was a laudable goal, but stressed the difficulties with trying to fix the criteria early on:

... it is recognized that there may be instances where one or more of the proposed criteria may not be applicable, and

also that additional criteria may be needed in other cases.... The ultimate goal is the evolution of industry codes based on accumulated knowledge and experience....

DX–SF–447, *AEC Annual Report to the Congress for 1965,* pp. 306–307.

Because there was so much conscious ignorance in the mid-1960's about what safety requirements the Government would ultimately impose, as it released the previously top-security nuclear technology into private hands, the Court is satisfied that it was reasonably foreseeable in 1965 that the safety regulations ultimately imposed might be significantly more restrictive and expensive than initially contemplated.

With regard to reprocessing and plutonium recycle specifically, the industry was commercially ignorant as of 1965. While it is true that reprocessing technology had been demonstrated in government facilities and that the first commercial reprocessing facility was opened shortly before the Westinghouse-Florida contract was signed, these facts alone did not promise success. Operation of private reprocessing facilities entailed numerous uncertainties that neither government operations nor the mere opening of a single facility could answer. The extent and expense of operational safety regulations to be developed for the industry should have been among the more obvious uncertainties.

Additionally, it was widely known that the volume of plutonium that would be produced in commercial facilities, unlike that which had previously been produced in the government facilities, could not all be absorbed by the needs of the government weapons programs. While scientists expected that plutonium recycle as reactor fuel would be feasible, the requisite technology had not yet been developed even to the experimental stage, and hence its potential environmental, health, and safety efforts obviously had not been analysed. A reasonable, informed person should have foreseen that if and when the technology was mastered, these potential effects might require analysis, which might in turn

lead to delays or previously unidentified problems.

Even Florida, with its relative ignorance vis-a-vis Westinghouse about the entire nuclear fuel cycle, recognized in 1965 the extent of the uncertainties about plutonium recycle plans, as evidenced in the following quote from an internal memorandum from one of Florida's contract negotiators written in the summer of 1965:

As is fairly well-known, the plutonium buy-back picture beyond 1970 is very cloudy, as no one known for sure what demand for plutonium will exist at that time. A number of studies are under way concerning the utilization of plutonium as a fuel in power reactors. Plutonium is a radioactive product and consequently must be handled in special ways. This will necessarily increase the price of fuel containing plutonium. It is not known at this time whether or not plutonium can be made into a competitive fuel. The general consensus concerning the prospective use of plutonium for military purposes seems to be that this will be limited in the future.

FPL–SF–85, Gardner Memorandum, pp. 7–8 (emphasis added).

As the underlined portion of the quote suggests, the foreseeable problems with plutonium recycle were not just technical. Indeed, safety and technology issues have always been almost inseparable in the nuclear industry. And because of the known lack of alternative uses for the plutonium beyond the limited military demands, uncertainty about plutonium recycle necessarily meant problems for the entire back-end of the fuel cycle, including reprocessing.

In sum, while the 1977–1981 ban on reprocessing was probably not specifically foreseeable in 1965, other independent developments that stymied reprocessing both before and after the ban were sufficiently foreshadowed in 1965 that a reasonable, informed person, or company, in the nuclear industry should have taken them into account.

(iii) *Westinghouse urges the Court to find that it was not reasonably foreseeable in 1965 that the removal and disposal clause of the contract might impose a substantial cost burden on Westinghouse.*

In support of this proposition, Westinghouse cites a number of mid-1970's documents indicating that removal and disposal costs had not previously been expected to entail a substantial cost burden. In fact, Westinghouse expected to net a profit of perhaps $16–19 million from removing and disposing of the fuel through reprocessing. This evidence does not, however, indicate whether or not Westinghouse should reasonably have been aware of a *contingency* that removal and disposal costs might be substantial, even though its *expectation* was that they would not be.

Westinghouse has not suggested any low-cost alternative to reprocessing that it could reasonably have expected in 1965 would be available if and when its reprocessing plans were to fail. That is, Westinghouse has not identified any options between the $16–19 million profit that it previously expected from reprocessing and the $70 million or more loss that is now expected. If spent fuel is not reprocessed, long-term storage of some sort appears to be the only alternative, and no one has suggested that long-term storage of the amount of spent fuel involved in this dispute could safely be accomplished for less than the $70 million fee that the DoE is charging for storage in its planned repository.

Indeed, the evidence is clear that it was widely known by at least 1965 that long-term storage facilities for radioactive materials would not be inexpensive. Though the industry was not then planning that spent fuel would be stored for long periods, it was then planning that radioactive wastes from reprocessing plants would be stored for the indefinite future. At the time, the radioactive wastes that had been produced in government reprocessing facilities were being stored on an interim basis in temporary storage bins located beneath the facilities. Those bins were expensive,

and had to be replaced every twenty years or so. The commercial reprocessing facilities were expected to use the same methods for the short term.

Research into the best and most economical means for permanently storing the materials was described in AEC Annual Reports for the mid-1960's as "continuing." *See, e.g.,* DX–SF–445, *AEC Annual Report to the Congress for 1963*, p. 166. Notably, the potential solutions being evaluated were conceptually of the same sort as the Government has now chosen for disposal of spent fuel—deep burial sites.

There was some suggestion in the testimony at the liability trial that the industry contemplated in 1965 that reprocessing facilities would be operated at a loss as a means of disposing of the spent fuel, even if reprocessing were to fail as a commercial venture. The suggestion was that long-term storage of the end-products of reprocessing might be cheaper than storage of spent fuel by a sufficient margin that the expense of the reprocessing plant could be justified on the grounds that it would minimize disposal costs, even if the end-products could not be re-cycled. This possibility becomes more realistic if it is assumed that the uranium end-product could be re-cycled and consequently that only the plutonium and radioactive wastes would require storage.

However, a mere showing that this method of disposal would be cheaper than the currently available method would not alone substantiate Westinghouse's claim that removal and disposal was not expected to impose a substantial cost burden. No one has suggested that the total foreseeable costs of this means of disposal were low—only that they might be somewhat lower than the high costs of spent fuel storage. Hence, it cannot be claimed that the current high costs are totally out of proportion to what this expense was expected to be. In any event, Westinghouse has not submitted any cost estimates on this method of disposal, either from 1965 or from current analyses. Accordingly, Westinghouse cannot, at least not on this record, point to this

option to show that the industry reasonably contemplated in 1965 that some low-cost means of removal and disposal would be available should commercial reprocessing be unavailable.

One additional possibility that Westinghouse may have contemplated in 1965 as a "low-cost" back-up to commercial reprocessing was the possibility that the Government would take spent fuel off the industry's hands at little or no cost to the industry if commercial reprocessing were to fail. In fact, Westinghouse implies that the Government promised that it would do just that, as part of its program to encourage private use of nuclear power. This possibility is best addressed separately, along with other assertions Westinghouse has made about the Government's policies in 1965.

(iv) *Westinghouse urges the Court to find that a series of Government actions which were unforeseeable in 1965 caused the difficulties with reprocessing and removal that developed in the 1970's.*

The significance of the 1977–1981 ban and of the GESMO proceedings on the plans for reprocessing have already been addressed. Beyond those, both the Government actions referenced and Westinghouse's complaints about them become somewhat amorphous. The argument appears to be that the Government assured the nuclear industry, from 1957 on through the 1960's, that neither removal nor any other aspect of the disposition of spent fuel would entail substantial costs for the industry, and that the Government backed this assurance with a promise that it would assume responsibility for commercial spent fuel at little or no cost if the industry were unable to do so. Governmental actions (and inactions, implicitly) in the late 1970's and 1980's represented an unforeseeable failure to make good on this earlier promise, Westinghouse contends.

A review of the evidence suggests that there is some limited validity to Westinghouse's position in this regard, but that neither the Government's earlier assur-

ances nor its later failures were as extreme as Westinghouse's contentions suggest.

The specific evidence that Westinghouse cites to show that the Government promised to assume responsibility for commercial spent fuel if the industry were unable to do so relates to an AEC policy announced in 1957 regarding reprocessing. Therein the government agreed to accept privately generated spent fuel for reprocessing unless and until commercial reprocessing services became available on reasonable terms and conditions. The Government would charge a fee for the service, and the regulation states that the fee would be based upon the costs estimated to be associated with a hypothetical commercial reprocessing facility. The end-products of the process would belong to the Government, and the user of the service would be credited with the value of those end-products to be determined in accordance with the AEC's guaranteed purchase prices for those materials.

This policy was to expire by its own terms on June 30, 1967. On January 2, 1968 the policy was renewed for an additional three years with the same basic elements, to expire December 31, 1970.

Westinghouse asserts that the policy was not again renewed in 1970 because the AEC had determined that the private reprocessing industry was sufficiently viable. The evidence Westinghouse relies on for this point does not express any AEC determination to that effect, nor does it expressly address why the policy was or was not renewed after 1970. However, it does suggest that the principle underlying the earlier policies, i.e. that government would provide the necessary services if the industry were unable to do so, remained in effect although the policy was not renewed.

It should be noted that as of 1963, the AEC's guaranteed purchase prices for the reprocessing end-products (plutonium and uranium 233) were established at levels not to exceed their estimated value as fuel in nuclear reactors.[3] Earlier the plutonium prices had been based on the higher weapons value rather than the estimated fuel value. The change was based on a determination that the latter was "the proper basis for the design and operation of civilian reactors and for the economic evaluation of nuclear power, rather than the higher plutonium price based on weapon value which was in effect through June 30, 1963." DX–SF–445, *AEC Annual Report to Congress for 1963*, p. 18.

The significance of this information is that it clarifies the nature of the offer the Government was making in the 1957 policy and the 1967 renewal thereof. Those policies involved the Government providing a service, in exchange for a reprocessing for less a credit for the reprocessing end-products. The reprocessing fee was to be based on the estimated cost of a commercial reprocessing facility, and the credit for the end products was to be based on their estimated commercial value. Accordingly, the underlying principle was that the Government would provide the necessary services *at their estimated cost* if the industry was not able to do so at the time the services were required. The promise was not to provide the services at a subsidized level should the services turn out to be expensive.

This interpretation is compatible with the AEC's general policies toward the nuclear power industry in the mid-1960's. Westinghouse is clearly correct that the Government was promoting private reprocessing and the nuclear industry generally during this period. The Government obviously believed that the nuclear industry, and specifically reprocessing, could be commercially viable, and it sought to convince the business community that this belief was well-grounded.

---

**3.** The AEC's policy as of 1964 was that guaranteed purchase prices for the plutonium and uranium end-products would be established only during the time required to develop and demonstrate the fuel application of these materials, which was expected to be by the mid-1970's. The plutonium guarantee at that time had been extended only through December 31, 1970. *See* DX–SF–446, *AEC Annual Report to the Congress for 1964*, p. 14.

However, its promotional efforts never rose to the level of an assurance of commercial viability. Indeed, one of the stated goals of the Government's policy was to generate sufficient experience to enable the AEC to evaluate whether or not nuclear power had practical value in this application. Given that this was an acknowledged open question, the AEC was in no position to guarantee the industry's viability, and it did not do so.

The Government's promotional methods generally were to offer to supply the industry the services needed for any stage of the fuel cycle for which services were not yet commercially available, be it uranium enrichment, fuel fabrication, reprocessing, plutonium buy-back, waste disposal, etc. When a given service became available from a private source at a competitive (i.e. non-monopoly, cost-based) price, the Government would withdraw its offer with respect to that service. All the while, the Government would charge a fee for the service designed to cover the Government's cost and to enable the industry to properly evaluate the commercial potential of nuclear power.

Significantly, the Government's offers rarely if ever mentioned a fixed amount for the fee. Instead, the offers typically would state only the method and assumptions that would be used to fix the fee on a case-by-case basis. The industry was left to its own devices in terms of predicting what the services would actually cost.

The government's stated object as of 1964 was to assist with some of the start-up difficulties of the new industry, so that the free market economy could then test the capabilities of nuclear power against those of other sources of power. The AEC explained this purpose in connection with the legislation it proposed to Congress in 1963, which was later enacted as the Private Ownership Act of 1964, as follows:

(2) [to] allow and eventually require electric utilities to obtain nuclear power under more nearly the same economic conditions that apply to coal, oil, and natural gas and thus permit a more realistic comparison of commercial aspects of nuclear and conventional power. Competitive nuclear power cannot really be demonstrated until normal economic factors relating to ownership and uses of nuclear fuels exist.

DX–SF–445, *AEC Annual Report to the Congress for 1963*, p. 18.

In this light, the lack of a subsidy in the AEC policies discussed would appear appropriate, and indeed an implicit subsidy would have appeared inappropriate. Accordingly, to the extent that Westinghouse may reasonably have inferred from the policies of the 1950's and 1960's that the Government would take responsibility for spent fuel in the 1970's if the industry proved unable to do so, Westinghouse should also have inferred that the Government would charge a cost-based fee for whatever services it provided.

Fairness dictates that the Court consider whether and to what extent the Government's policies of the 1970's and after have deviated from what Westinghouse could reasonably have expected. Westinghouse's claims about the Government's actions regarding reprocessing have already been addressed. Leaving them aside, the first Government action regarding spent fuel in the 1970's was the DoE's announcement in October of 1977 of a government proposal to accept and take title to spent fuel for interim and long-term storage, in return for a one-time storage fee. The storage fee was to be calculated to cover the full costs of the interim storage and ultimate disposal. The DoE described this proposal as "a logical extension, given the indefinite deferral of reprocessing, of the long-established federal responsibility for permanent disposal of high-level wastes." DX–SF–219, DoE Press Release October 18, 1977, "DoE announces New Spent Nuclear Fuel Policy."

The announcement of the policy was followed in July of 1978 by an announcement of rough estimates of what the disposal fees would be. Assuming that Turkey Point is a typical-sized reactor, these estimates would translate into a combined in-

terim and permanent disposal fee of rough-
ly $7 million for the amount of spent fuel
generated each year.[4]  Had the Govern-
ment proceeded with the 1977 plan, then,
the spent fuel disputed in this case—which
is ten years' worth—could have been
turned over to the Government for a fee on
the order of $70 million.  This amount is
not substantially less than the almost $100
million that Florida now says interim and
permanent storage will cost.

Despite the provisions for passing these
substantial costs on to the industry, West-
inghouse makes no complaint about the
1977 policy except that it was abandoned.
In fact, Westinghouse quotes with approval
the DoE statement that this policy was a
logical extension of the federal govern-
ment's earlier policies on which it had re-
lied.

From 1977 to 1981, the Government ex-
plored ways to carry through with the poli-
cy announced in 1977.  There was a tempo-
rary reversal in 1981 during which the ex-
ecutive branch allegedly took the position
that the spent fuel was solely private in-
dustry's problem.  But in early 1983, Con-
gress passed the NWPA of 1982, which in
fact had been under consideration since at
least early 1981.  This Act in large part is a
fulfillment of the Government's earlier
commitments regarding spent fuel.  It is
consistent with the program announced in
1977 in that the Government agrees to
accept and take title to the spent fuel in
exchange for a one-time, cost-based dispos-
al fee, which program in turn was a logical
extension of the Government's position in
the 1960's, as Westinghouse acknowledges.

The 1982 Act modifies the program an-
nounced in 1977 regarding the interim stor-
age of spent fuel, by encouraging on-site
storage to the maximum extent possible,
with federal AFR space only for spent fuel
that cannot feasibly be stored on-site.  This
modification, however, was compelled by a
determination that interim storage on-site
would be cheaper and easier than interim
storage off-site, and hence it works only to
the advantage of the parties who would be
paying the costs either way.

A second modification is in the area of
timing.  Whereas the 1977 proposal implied
that the Government would accept spent
fuel within five years after the policy was
adopted, the NWPA states that the perma-
nent federal repository will not be available
until at least 1998.

In fact, this delay is indicative of longer
total slippage in the timing of the Govern-
ment's fulfillment of its implied commit-
ment.  The original understanding was
that the Government would provide the ser-
vices *when needed* if the industry were
unable to do so.  Hence to have fulfilled
this commitment, the Government should
have been prepared to accept private spent
fuel whether for reprocessing or disposal,
as early as the mid-1970's, when the pros-
pects for commercial reprocessing began to
falter.  The Government will be 20–25
years behind that schedule if the federal
repository becomes available in 1998 as
planned, and if, as the parties suspect, the
repository is not available on time, the total
delay will be even greater.

Perhaps Westinghouse should reason-
ably have been aware in the mid-1960's
that the Government might not be in a
position to take the spent fuel off the in-
dustry's hands immediately if and when
industry became unable to do so, but West-
inghouse could reasonably have assumed
that the service would have been available
in a commercially reasonable time so as to
minimize expenditures on temporary, stop-
gap solutions such as interim storage.
Hence, Westinghouse is correct in assert-
ing that the Government unforeseeably did
not fulfill this timeliness aspect of its im-
plied commitment to the industry.

---

**4.**  *See* DX–SF–462, "Federal Facilities for Storing
Spent Fuel—Are They Needed?," Report by the
Comptroller General to Congress, June 27, 1979,
p. 19.  Actually the reactor units at Turkey Point
must be smaller than the typical reactor on
which this report bases its estimates, as the
Turkey Point Units each appear to discharge
roughly half the annual volume of spent fuel
that the report assumed.  However, the total
annual discharge of the two Turkey Point units
appears roughly equal to that of the typical
reactor on which the report based its estimates.

## D. Equitable Adjustment Factors

Westinghouse asserts that it has already expended roughly $180 million in performing its fuel contract with Florida but has received revenues of less than $164 million; hence Westinghouse has already incurred losses in excess of $16 million as a result of the contract. On the other hand, Westinghouse asserts, Florida's ratepayers have already saved approximately $1.3 billion as a result of the contract and the use of nuclear power instead of fossil fuel at Turkey Point, and they are expected to save an additional $5.2 billion by 1992.

Florida quibbles with several of the precise figures put forth, but its only substantial comment is that in evaluating Westinghouse's losses the fuel contract should be considered only in conjunction with the two Turkey Point plant contracts between Florida and Westinghouse. The evidence confirms Florida's assertion that the three contracts were entered into at the same time as part of a single deal and hence should be considered together. Totalling the figures for the three contracts, Westinghouse has incurred costs of $224 million and received revenues of $236 million, with a net loss of $12 million. A number of equitable factors are not reflected in these figures, such as the intangible costs Florida has incurred and the intangible benefits Westinghouse hoped to gain from the contract. These factors were described in the 1981 decision and need not be repeated here.

### Analysis

The extensive consideration of the factual developments reflected in the summary *supra* has resulted in relatively little change in the Court's legal conclusions from 1981. The 1981 decision was intended to thoroughly and accurately set out the law on commercial impracticability and the related common law defenses that govern this case, and it will not be repeated here. As to whether the Court's intention was fulfilled must be left to a higher authority.

■ However, before proceeding to apply the principles to the facts as found, a new legal argument that Westinghouse has raised needs to be addressed. This argument, based on the doctrine announced in *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), had substantial appeal on first examination, but the Court has now determined that the law relied on is inapposite to the issues that the facts pose here. In concluding otherwise the Court was wrong—unequivocally wrong. The Court takes some solace in the fact that the advocacy which led the Court to its erroneous conclusion was exceptional. Nevertheless, litigants are entitled to a judge's best effort and the awkwardness of admitting error is neither an excuse nor a deterrant.

Westinghouse argues that the damages for which Florida now seeks compensation are unforeseeable consequential damages, just as the lost profits of the mill owner in *Hadley* were unforeseeable consequential damages of the delivery person's failure to deliver the broken shaft to the repair shop as promptly as he had promised.

Under this analysis, Westinghouse argues, the key factual issue is whether the damages that Florida now seeks were foreseeable when the contract was made in 1965. Because no one foresaw that removal and disposal would cost the extraordinary amount now contemplated, Westinghouse, so its argument goes, is not liable for that amount.

■ The Court is now satisfied that this approach is misguided, and the reason is difficult to comprehend only because of its simplicity: the damages that Florida is seeking are not consequential at all. Westinghouse contracted to remove and dispose, but failed to do so. Florida now seeks the cost of removal and disposal, i.e., of obtaining "cover" for Westinghouse's breach. These are damages, with minor exception, of the most direct sort imaginable. Perhaps one or two of the items in Florida's itemization might be properly labelled consequential. For instance, the property tax increase that building new storage facilities at Turkey Point generated might fairly be described as consequential damage. But the most significant disputed item is the

$70 million disposal fee that Florida must pay the United States to remove and dispose of Florida's spent fuel. There is simply nothing consequential about it.

Indeed, there is nothing unforeseeable about the damages except perhaps the amount: it was not only foreseeable but a virtual certainty that if Westinghouse failed to remove and dispose, Florida would suffer damages in the amount necessary to obtain removal and disposal from some other source. This is in fact the definitional difference between direct and consequential damages. The former are kinds of damages that are so certain to follow that it makes no·sense to ask whether they were foreseeable. Uncertainty in the amount, rather than the kind, of damage is not the sort of uncertainty that *Hadley* addresses. The foreseeability of the amount of direct damages—i.e. the foreseeability of the cost of obtaining "cover"— has potential legal significance in a commercial impracticability·analysis, but it has no place in a *Hadley* analysis.

The proper analogy between the instant facts and the *Hadley* facts would be to suppose that the delivery person in *Hadley* had been unwilling and/or unable to perform his delivery promise at all, due to a series of events that he claimed were unforeseeable at the time he made the contract—perhaps, illustratively, war broke out on the ordinary delivery route. Suppose then that the mill owner obtained delivery service from another source, but that the price he had to pay for it was quite high—perhaps for the same reasons that the original delivery person had not performed.

If the mill owner were then to sue the delivery person, not for the mill's lost profits, as happened in the actual *Hadley* facts, but for the price paid for the substitute delivery service, clearly the delivery person could not argue under *Hadley* principles that the price paid for the substitute delivery service was an unforeseeable consequential damage of this breach. He promised to deliver the shaft; he did not do so; and the mill owner seeks nothing but the cost of substitute performance. The delivery person may have a commercial impracticability defense, but if he argued that the cost of substitute delivery service was an unforeseeable consequential damage, he would, in this Court, be destined to fail.

None of the cases that Westinghouse cites in support of its *Hadley* argument involved situations in which a breaching promisor sought to avoid paying the promisee for the cost of substitute performance because the cost was unforeseeably high. In fact, in most of those cases, as in *Hadley*, the promisor had performed his promise, but had done so inadequately or late. The promisee did not contest his obligation to pay the contract price for the performance, but he sought compensation for extra expenditures he had incurred that he attributed to the inadequacy or delay in performance. *Skibs A/S Gylfe v. Hyman-Michaels Co.*, 438 F.2d 803 (6th Cir.1971); *Barnard-Curtiss Co. v. United States*, 257 F.2d 565 (10th Cir.1958); *Alex v. Henry S. Conrey, Inc.*, 380 F.Supp. 1147, 1151–52 (E.D.Pa.1974), *aff'd without opinion*, 511 F.2d 1392 (3rd Cir.1975). Here, Westinghouse has not performed merely inadequately or late; it has not performed at all.

The Restatement (Second) of Contracts addresses this issue as follows:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

in the ordinary course of events, or
As a result of special circumstances, beyond the ordinary course of events, that the party in breach had a reason to know.

Restatement (Second) of Contracts § 351 (1981).

▮ The language of the Restatement—focusing as.it does on the foreseeability of the *loss* rather than the foreseeability of the *damages*—supports the Court's interpretation that the *Hadley* foreseeability test is to be applied to the kind, not the

amount, of damage. The Court has no doubt that the kind of loss for which Florida now seeks a damages award was the sort that follows in the ordinary course of events upon Westinghouse's failure to perform.

Hence the case will turn on the Court's resolution of the commercial impracticability and related defenses. The Uniform Commercial Code summarizes all the factors relevant to the defense of commercial impracticability and the related Florida common law defenses in a single sentence, as follows:

> Except so far as a [promisor] may have assumed a greater obligation and subject to the preceding section on substituted performance: ... delay in [performance] or [non-performance].... is not a breach of his duty...if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made....

Fla.Stat. 672.615.

### I

Westinghouse proposes that an unforeseeable political determination regarding reprocessing was responsible for the demise of reprocessing, which in turn has made performance of Westinghouse's obligation to "remove and dispose" either impossible or unforeseeably expensive.

The Court agrees that the ban on reprocessing in effect from 1977 to 1981 resulted from a political determination about the national security risks of reprocessing, and also that this ban was not specifically foreseeable. For a number of reasons, however, the Court is satisfied that this unforeseeable contingency does not excuse Westinghouse from its obligation to remove and dispose.

To show that this unforeseeable contingency amounts to commercial impracticability, Westinghouse must show among other things that it was a basic assumption of the contract that reprocessing would not become unavailable on purely political grounds. Unlike the various commercial

and technological risks of reprocessing and plutonium recycle, the evidence does not reveal a conscious awareness on Florida's part of this risk, and consequently there was no attempt to allocate this particular risk explicitly to Westinghouse.

However, Florida's general "suit of clothes" negotiating strategy would appear to encompass this sort of risk as well. As found in the 1981 decision, one of the basic and mutual assumptions of the contract was that Florida would have "no involvement whatever with reprocessing, or with whatever alternative disposition Westinghouse might make of the spent fuel." 517 F.Supp. at 455. The new evidence and arguments have not suggested any reason why this finding should be revised. When this basic and mutual assumption is kept in mind, the inference from the unforeseeability of the ban to an implied basic assumption of the contract that there would be no such ban is not direct. This is particularly so in light of Westinghouse's evidenced willingness in 1965 to take abnormal risks, both known and unknown, and Florida's cautious insistence that its costs not be tied to any of the uncertainties surrounding nuclear power.

In any event, the case does not turn on the resolution of this issue, because Westinghouse has failed to convince the Court that the political ban on reprocessing was the key cause of its unavailability. As discussed *supra*, a conglomerate of foreseeable commercial, technological, and safety considerations delayed the development of reprocessing before the ban and have prevented its development since the ban was lifted.

The nuclear industry of 1965 stands in marked contrast to the sewerage business of 1917 in this regard. *See Kansas City, Missouri v. Kansas City, Kansas*, 393 F.Supp. 1 (W.D.Mo.1975). In that case, the contract entered into in 1917 provided that one city would receive and dispose of the other's sewage. At the time, this required no more than channeling the sewage through the promisor city's pipes to the

river. In the 1970's, federal pollution laws required the promisor city to build an expensive waste water treatment plant to treat sewage that it had previously dumped directly into the river. The promisor city sought to impose a proportionate share of the cost of the plant on the promisee city. The promisee city relied on the 1917 contract, and the promisor city claimed commercial impracticability as to it.

In the suit that followed, both parties conceded that neither of them had foreseen in 1917 the sewage treatment requirements that federal law was to impose in the 1970's. The Court further found that, "Indeed ... the parties in fact did not foresee the possibility that any pollution controls whatever would ever be imposed." *Kansas City,* 393 F.Supp. at 5. Accordingly, the Court found the promisor excused by commercial impracticability from performing the 1917 contract without additional compensation.

In the instant situation, the industry knew in 1965 that federal regulation and control was to be intensive, and it further knew that the precise requirements that would ultimately be imposed were not yet fixed. A reasonable informed business-person in the industry would have known that the precise requirements were subject to change and would also have been aware that the extent of the changes to be made were unknown. *Compare Eastern Air Lines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429, 454 (S.D.Fla.1975) (Gulf was aware of the constantly changing government price regulations for oil).

Accordingly, AEC/NRC studies and regulations regarding reprocessing, which made performance of Westinghouse's "remove and dispose" obligation more difficult or expensive, but which fell short of preventing performance, would not be grounds for releasing Westinghouse from its obligations here. They were reasonably foreseeable, and the promisor "is presumed, in the absence of evidence to the contrary, to have agreed to bear any loss

occasioned by an event which was foreseeable at the time of contracting." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957 (5th Cir.1976).[5] Here "evidence to the contrary" is totally absent; indeed the evidence strongly supports the presumption.

## II

Westinghouse contends that performance as agreed of its removal and disposal obligation has been rendered impossible by the unavailability not only of reprocessing but also of any other means of removal.

As discussed *supra,* Westinghouse has not convinced the Court that it could not have removed at least some of the spent fuel exactly as agreed—i.e. within six months to a year—had it energetically attended to its contract obligations in the early 1970's. And regardless of this conclusion, it is now possible to secure removal and disposal services for all of the disputed spent fuel through Florida's contract with the DoE for its diposal pursuant to the NWPA.

Westinghouse contends that this latter option is not removal "as agreed," because the parties' implicit agreement was that removal would take place within six months to a year, whereas the federal repository will not be available until at least 1998. The Court stands by its earlier finding of an implicit agreement that removal would take place within six months to a year, and hence agrees that performance via a contract pursuant to the NWPA would not be performance exactly "as agreed." However, the fact that a promisor is unable to perform on time would not ordinarily excuse it from the obligation to perform altogether. Rather, the promisor should be obliged to perform as soon as it reasonably can do so.

The implicit timeliness clause in the instant contract is more reasonably understood as a secondary promise than as an exclusive method of, or condition precedent

---

**5.** This phrase was incorrectly quoted in the 1981 decision, 517 F.Supp. at 455. The error was merely typographical, and the Court's analysis was based on the correct quote.

to, performance. Spent fuel simply will not go away on its own with time. The parties, in obligating Westinghouse to remove on a certain schedule, could not reasonably have intended that Westinghouse would be freed of the removal obligation altogether if the schedule could not be met.

Especially in light of the fact that Westinghouse agreed to remove and dispose of the spent fuel in conscious ignorance of how it would do so should reprocessing prove unworkable, the practicability of performance by alternative means should be judged relatively strictly. *See Transatlantic Financing Corp. v. United States*, 363 F.2d 312, 319 (D.C.Cir.1966). In that case, the shipper claimed that performance by the route contemplated—through the Suez canal—was impossible. The Court held the shipper to performance by a commercially practicable alternative route. Although on the facts before it the Court found that use of the Suez route was just "an implied expectation" rather than an agreed-upon method of performance, the Court made clear that its ruling could apply even if there was an express expectation or agreement as to the method of performance. *See Transatlantic*, 363 F.2d at 317 and n. 9; *see also American Trading and Production Co. v. Shell International Marine, Ltd.*, 453 F.2d 939 (2nd Cir.1972); Fla.Stat. 672.614.

The key would be the intent of the parties at the time of contracting, and the Court is satisfied that had they addressed this issue, the instant parties would have intended performance as soon after six months to a year as possible, should performance on that schedule become impossible. Consequently, the Court will, in the absence of a commercial impracticability defense, hold Westinghouse to performance via the disposal method fixed in the NWPA.

### III

■ This leads to the question of whether unforeseeable contingencies have made performance of the "remove and dispose" clause so expensive as to rise to the level of commercial impracticability. Leaving aside for the moment inquiries into the foreseeability of the contingencies suggested, the Court is satisfied that the expense in this case is not so extreme as to constitute commercial impracticability.

The law on this point is summarized in "Comment d" to the Restatement 2nd on Contracts, § 261 (1981) as follows:

Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties involved. However, ... a mere change in the degree of difficulty or expense..., unless well beyond the normal range, does not amount to impracticability ....

There is no question that the $70 million cost of disposing of the spent fuel in the DoE repository is high; in combination with the $17 million for the first re-racking and consequential damages that Florida seeks, the total cost is very high. However, the significance of these figures must be evaluated in context.

Westinghouse's total revenues over the three connected contracts it signed with Florida in 1965 were approximately $224 million. This figure does not reflect revenues from subsidiary service contracts nor the intangible benefits Westinghouse received. The maximum cost of performing the removal and disposal obligation, therefore, is in the range of 40–45% of contract revenues. Westinghouse has already expended $236 million in costs on the contracts, and hence if it is found liable for the full amounts Florida seeks, its total losses will be just under 50% of total contract revenues.

■ While this expense is high, it is not beyond the normal range of risk that a promisor signing a fixed-price contract in a new high-risk field could have expected. A loss alone is not sufficient to show commercial impracticability. Using the total revenues on the three contracts as an indicator of the range of Westinghouse's financial dealing, a loss on the order of $87 million would not be totally out of proportion to

the amounts in which Westinghouse has chosen to deal. Courts usually have rejected commercial impracticability claims where cost increases were in this range relative to the total revenues and costs. *See American Trading v. Shell International,* 453 F.2d at 942 (2nd Cir.1972), (increase in costs of one-third over agreed price of contract not commercial impracticability; citing English cases in which 50% and 100% increases in costs were not adequate to establish impracticability).

If Westinghouse had conducted any investigation whatsoever in 1965 as to what costs would be incurred for removal and disposal should the contemplated reprocessing ventures fail, it would have been aware that the expense might be great. Accordingly, Westinghouse's surprise at the high cost is attributable more to its own failure in 1965 to study and evaluate the potential costs than to any unforeseeable contingencies. An argument to the effect that any such potential costs were either unknown or incapable of ascertainment simply strengthens the Court's conclusion that a reasonable company in the nuclear business would have recognized and appreciated the potentially high cost.

## IV

Westinghouse contends that a series of Government actions in the 1970's and 1980's have rendered performance of the "remove and dispose" obligation impossible and/or impracticable. As discussed *supra,* the Court rejects for the most part Westinghouse's factual contentions in this regard. All that remains to be addressed is the significance of the fact that the Government did not act in a timely fashion in honoring its implied commitment regarding spent fuel.

The Court is satisfied that this failing on the part of the Government was an unforeseeable contingency the non-occurrence of which was a basic assumption of the contract and which has rendered performance of Westinghouse's implicit timeliness obligation to Florida impossible. No one could have anticipated the poor planning, delays, and policy reversals that have added up to more than twenty years of delay, after the outlook for commercial reprocessing became clouded, before the Government will be providing any alternative. Both Florida and Westinghouse were aware that reprocessing might not be available, but neither of them anticipated that no alternative means of removal would be available until 1998 or after. This assumption can be inferred from their mutual agreement to build only six months to a year's worth of capacity into the original storage facilities at Turkey Point.

This conclusion is not dependent on a finding that Government policy deficiencies were responsible for the unavailability of AFR storage in the 1970's and after. The Court stands by its conclusion that AFR sites were not developed primarily because on-site interim storage turned out to be cheaper and easier. The failing in the Government's policies was that a permanent means of disposal was not available in time to avoid *unnecessary* costs for interim storage *either* on-site *or* off-site. While perhaps some amount of interim storage would have been required even if the Government had pursued a consistent, rational policy throughout, the Court is satisfied that at least some of the interim storage costs must be attributed solely to unnecessary delays in the fulfillment of the Government's implied commitments. Westinghouse cannot fairly be held liable for the full amount of these unnecessary costs.

Consequently, the Court has determined that an equitable allocation of the interim storage costs is in order. The Court has been given no reason to suspect that the costs of the permanent federal repository have been increased by the delays, hence the DoE disposal fee will not be allocated.

### Conclusion

In making the allocation, the Court must of necessity utilize its own sense of fairness. There is no precise means for isolating the costs attributable to the unforeseeable delays. The fact that Florida's rate-

payers have benefitted enormously from the use of nuclear power weighs heavily in favor of allocating these costs to Florida, who presumably will be able to pass them on to its ratepayers. On the other hand, as Florida has pointed out, Florida (and its ratepayers, presumably) will bear the potentially substantial burden of any further delays or uncertainties that develop in the Government's plans.

Additionally, if all the interim storage costs were allocated to Florida, Westinghouse would in effect be rewarded for its lack of diligence in the early 1970's, for if Westinghouse had removed some quantity of spent fuel from Turkey Point to an off-site location, which the Court found it probably could have done, then Westinghouse would have incurred the interim storage costs for that portion directly. On the other hand, the second reracking will give Florida sufficient interim storage space for its own spent fuel as well as for the ten years' worth of spent fuel that Westinghouse contracted to remove.

Considering these factors, the Court has determined it appropriate to divide the costs of the two re-rackings at Turkey Point between the parties. Without attempting mathematical precision, the allocation will divide the costs roughly as if Westinghouse were absorbing the costs of the first re-racking and Florida absorbing the costs of the second. Because Westinghouse has in fact already agreed, for reasons independent of those that counselled this allocation to the Court, to perform the second re-racking at Turkey Point at no cost to Florida, the Court will set off against Westinghouse's other liabilities an amount equal to the estimated cost of the second re-racking.[6]

Florida seeks a number of elements of damages beyond the re-racking costs and the permanent disposal fees. The property tax and insurance premium increases at Turkey Point are largely at-tributable to the unforeseeable delay in the availability of the permanent disposal site. The property tax increase additionally is an unforeseeable consequential damage of the failure to remove.

Florida incurred the consultants' fees for which it seeks recompense as part of its efforts to settle and/or prevail in the remedies stage of this litigation; as such the fees are properly considered one of the unavoidable costs of litigation, as to which each party must bear its own.

Accordingly, the Court is not satisfied that Westinghouse should be held liable for any of these additional elements of damages.

In sum, Westinghouse will be held liable for the $70 million permanent disposal fee and for the cost of the first re-racking, including the cost of cask rentals and interest, against which Westinghouse will be credited roughly $12.7 million for performing the second re-racking. The additional damage elements that Florida seeks will be denied.

The sums aforementioned are not intended to be precise. The Court is satisfied that the parties, who have worked so diligently toward settling their differences, will now be able to draft an appropriate decree in accord with the Court's view as expressed herein. It may well be, for example, that Westinghouse can simply assume Florida's obligation under the contract with DoE—a contingency which might well inure to their mutual benefit.

An appropriate order will issue.

---

6. For reasons not completely clear to the Court, the evidence is that Westinghouse will be able to perform the second re-racking for an estimated cost of $6 million, but that the same re-racking would have cost Florida an estimated $12.7 million if Westinghouse had not agreed to perform it. The Court will credit the full $12.7 million against Westinghouse's liabilities to Florida.